**ROTEC INDUSTRIES, INC.,**
**Plaintiff–Appellant,**

**v.**

**MITSUBISHI CORPORATION, Tucker Associates, Inc. and Garry Tucker,**
**Defendants–Appellees,**

**and**

**Mitsubishi International Corporation,**
**Defendant–Appellee.**

**No. 99–1275.**

United States Court of Appeals,
Federal Circuit.

June 13, 2000

George P. McAndrews, McAndrews, Held & Malloy, Ltd., of Chicago, Illinois, argued for plaintiff-appellant. With him on the brief were John J. Held, Thomas J. Wimbiscus, Matthew G. McAndrews, and James R. Nuttall.

Michael O. Warnecke, Mayer, Brown & Platt of Chicago, Illinois, argued for defendants-appellees Mitsubishi Corporation, Tucker Associates, Inc., and Garry Tucker and for defendant-appellee Mitsubishi International Corporation. With him on the brief were Debra Rae Bernard and Walter M. Rogers.

David T. Audley, Chapman and Cutler, of Chicago, Illinois, for defendant-appellee Mitsubishi International Corporation.

Before NEWMAN, MICHEL, and GAJARSA, Circuit Judges.

Opinion for the court filed by Circuit Judge GAJARSA. Opinion concurring in the judgment filed by Circuit Judge PAULINE NEWMAN.

GAJARSA, Circuit Judge.

## DECISION

Rotec Industries, Inc. ("Rotec") appeals the December 14, 1998 order of the United States District Court for Central District of Illinois granting summary judgment to Mitsubishi Corporation, Tucker Associates, Inc., Garry Tucker and Mitsubishi International Corporation on Rotec's claims of infringement of United States Patent No. 4,170,291 (the "'291 patent"). *See Rotec Indus., Inc. v. Mitsubishi Corp.*, 36 F.Supp.2d 810 (C.D.Ill.1998). Because we find that the district court did not err in its determinations, we affirm.

## BACKGROUND

Rotec is a manufacturer of crane and conveyor systems designed to carry concrete over long distances. These systems are useful in large construction projects, such as the construction of river dams. Rotec is the assignee of record of the '291

patent. The '291 patent discloses a tower crane supported articulated concrete conveyor belt system. Rotec sells a system disclosed by the '291 patent under the trade name "Tower Belt."

On August 9, 1995, the government of the People's Republic of China ("PRC") solicited bid proposals for five units of a concrete placing system to be used in the Three Gorges Dam project on the Yangtze River. All proposals were required to meet the specifications set forth by the Chinese Three Gorges Dam Project Corporation ("TGDPC"). Defendants Mitsubishi Corporation and Mitsubishi International (collectively, "MC") approached Defendant Potain, a French corporation, to propose that Potain become a partner with MC to submit a joint bid proposal. According to Defendants, Potain was working on the design of a conveyor system at that time jointly with C.S. Johnson ("Johnson"). As a result, Johnson was also invited to join in the proposal. Shortly thereafter, Johnson contacted Defendant Garry Tucker ("Tucker") of Defendant Tucker Associates, Inc. ("TA") for additional help in preparing the bid. Tucker agreed to serve as an independent contractor to perform the design work for the project, and attended a formal pre-qualifying bid conference that took place in the PRC in October of 1995.

On January 16, 1996 Potain and MC submitted their joint bid to the PRC to supply the equipment. The parties subsequently negotiated for nearly a year, and on December 16, 1996, Potain, MC and the TGDPC signed a purchase and sale agreement for two of the complete concrete placing systems requested. The terms of the agreement provided for two alternative arrangements. Under one alternative, Potain would design and manufacture the cranes used in the systems, and Johnson would design and manufacture the conveyors. Under the other alternative, Potain would provide all of the necessary components. Under either arrangement, MC would provide the financing.

According to Rotec, much of the activity that preceded the Potain/MC/TGDPC agreement took place in the United States. Specifically, it asserts, *inter alia*, that:

1. the offering parties met several times in the United States;

2. a delegation from China visited Johnson's headquarters in Champaign, Illinois during the week of December 8, 1996;

3. Tucker prepared pricing information and worked on finalizing design and financial aspects of the bid proposal at his offices in Oregon and at Johnson's Champaign, Illinois headquarters;

4. Johnson provided relevant technical and financial documents to Potain to be used in the preparation of the project bid; and

5. the offer provided that non-staple components were to be made in the United States by a designated U.S. supplier.

On February 14, 1997 Rotec filed suit against MC, Tucker, TA, Potain and C.S. Johnson in the United States District Court for the Central District of Illinois. The lower court exercised jurisdiction over the case under 28 U.S.C. §§ 1331, 1338(a) and 1367(a) (1994). In its Second Amended Complaint, Rotec alleged that Defendants infringed the '291 patent by making an "offer for sale" of the invention claimed therein in the United States, in violation of 35 U.S.C. §§ 271(a) and 271(f) (1994). Rotec also alleged a civil conspiracy to commit patent infringement between and among Defendants and Johnson,[1] in violation of Illinois state law.

Pursuant to Fed.R.Civ.P. 12(b)(6), Defendants moved to dismiss the Second Amended Complaint on two grounds.

---

1. Although named as a co-defendant in the original complaint, Johnson was not named in the Second Amended Complaint after it filed for Chapter 11 bankruptcy in July 1997.

First, Defendants moved to dismiss for failure to state a claim, arguing that Rotec could not prove that Defendants committed the alleged act of infringement—the offer to sell—within the United States. Second, Defendant Potain moved to dismiss for lack of personal jurisdiction. After allowing limited discovery on these issues, the district court granted Potain's motion to dismiss for lack of personal jurisdiction, and treated the remaining motions as motions for summary judgment under Fed.R.Civ.P. 56.

On December 14, 1998, the district court granted Defendants' summary judgment motions after finding insufficient evidence of an offer for sale within the United States. The court held that there was no genuine dispute as to the following facts:

1. the agreement called for all of the conveyor components to be made in Japan and China, regardless of what may have been provided in earlier proposals;

2. no components were actually made in the United States;

3. the bid proposal, including the description of the product and the proposed price, was finalized in Hong Kong and presented in China;

4. all negotiations with the Chinese government prior to signing the agreement took place in China; and

5. the agreement was signed in China.

*See id.* at 815, 817. The court also held that Rotec's evidence of a meeting between Johnson and a TGDPC delegate in the United States was incompetent hearsay. As a result, the court concluded, "Plaintiff cannot establish an essential element to its cause of action for patent infringement, an act of infringement in the United States." *Id.* at 817 (citation omitted). Having dismissed Rotec's federal law claims, the court then declined to exercise supplemental jurisdiction over the remaining state law claim. *See id.* at 818. On January 12, 1999, the district court denied Rotec's motion for reconsideration. *See id.* at 818–19.

Rotec now appeals the district court's judgment of non-infringement.

## DISCUSSION

### A. Standard of Review

As noted above, the district court, pursuant to Fed.R.Civ.P. 12(b)(6), treated Defendants' motion to dismiss as a motion for summary judgment. "Rule 12(b)(6) provides that if matters outside the complainant's pleading are presented to the court the motion shall be treated as one for summary judgment under Rule 56." *Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.,* 988 F.2d 1157, 1164, 26 USPQ2d 1038, 1044 (Fed.Cir. 1993). Thus, we must treat Defendants' motions as motions for summary judgment in reviewing the propriety of the district court's order.

 This court reviews all grants of summary judgment by a district court *de novo. See Conroy v. Reebok Int'l, Ltd.,* 14 F.3d 1570, 1574, 29 USPQ2d 1373, 1376 (Fed.Cir.1994). Accordingly, the court must decide for itself "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party is entitled to summary judgment when the nonmoving party "fails to make a showing sufficient to establish the evidence of an element essential to that party's case ... since a complete failure of proof concerning an essential element ... necessarily renders all other facts immaterial." *Celotex,* 477 U.S. at 322–323, 106 S.Ct. 2548. In addition, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475

U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (footnote omitted).

### B. Rotec's § 271(a) Claim

Under 35 U.S.C. § 271(a) (Supp.1997), "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States" infringes the patent. According to Rotec, Defendants violated § 271(a) when they "offered to sell" the invention claimed in the '291 patent to TGDPC. For the purposes of the motions now before this court, Defendants do not dispute that the '291 patent claims the system they offered to sell to TGDPC. They do dispute, however, that they made any offer for sale to TGDPC in the United States. Defendants say their offer was made in China, not the United States, thereby absolving them of any § 271(a) liability.

■ There is no genuine dispute that at least some of Defendants' activities before signing the agreement with TGDPC took place in the United States. At the same time, it is also undisputed that many of these activities took place outside the United States, in China and elsewhere. These extraterritorial activities however, are irrelevant to the case before us, because "[t]he right conferred by a patent under our law is confined to the United States and its territories, and infringement of this right cannot be predicated of acts wholly done in a foreign country." *Dowagiac Mfg. Co. v. Minnesota Moline Plow Co.,* 235 U.S. 641, 650, 35 S.Ct. 221, 59 L.Ed. 398 (1915) (citation omitted). Thus, we must establish whether Defendants' activities in the United States, as would be construed by a reasonable jury, are sufficient to establish an "offer for sale," as that phrase is used in § 271(a). If these activities are sufficient to establish an "offer for sale" as a matter of law, we must find that the district court erred in granting Defendants' motions. If not, we must affirm.

### 1. Historical Background

The statutory history of § 271(a) may be divided into two distinct periods: before the GATT Uruguay Round Trade Related Aspects of Intellectual Property ("TRIPS") agreements, and after. Before the TRIPS agreements, § 271(a) granted the patent holder the right to exclude others only from "making, using or selling the patented invention throughout the United States." This court had construed this grant strictly, so that "neither intent nor preparation [to sell] constitute[d] infringement." *Laitram Corp. v. Cambridge Wire Cloth Co.,* 919 F.2d 1579, 1583, 16 USPQ2d 1929, 1932 (Fed.Cir. 1990). In addition, a party could not be held liable for threatening infringement, contracting to make infringing devices, or even beginning construction of infringing devices. As we noted in *Eli Lilly & Co. v. Medtronic, Inc.,* 915 F.2d 670, 673, 16 USPQ2d 2020, 2023 (Fed.Cir.1990), § 271(a) did not cover acts other than an *actual* making, using or selling of the patented invention in its completed form. Moreover, the Supreme Court held in *Deepsouth Packing Co. v. Laitram Corp.,* 406 U.S. 518, 527, 92 S.Ct. 1700, 32 L.Ed.2d 273 (1972), that § 271(a) excluded various activities prior to an actual sale. The Court found that "sales rhetoric and related indicia such as price" could not infringe a patent unless the patentee proved the defendant was "selling the patented invention." *Id.*

In 1993, however, the United States completed negotiations on the TRIPS agreements. As a result of these negotiations, the United States agreed to amend its patent law to impose additional infringement liability for "offers to sell." In 1994, Congress enacted a statute to satisfy the nation's pledge under TRIPS. The statutory language of the amendment to § 271(a) provided that, after January 1, 1996, "whoever without authority makes, uses, *offers to sell,* or sells any patented invention, within the United States ... infringes the patent." (emphasis added).

Unfortunately, other than stating that an "offer to sell" includes only those offers "in which the sale will occur before the expiration of the term of the patent," 35 U.S.C. § 271(i) (Supp.1997), Congress offered no other guidance as to the meaning of the phrase.

■ When the language of a statute fails to provide clear and unambiguous direction, we may turn to the statute's legislative history. *See Toibb v. Radloff,* 501 U.S. 157, 162, 111 S.Ct. 2197, 115 L.Ed.2d 145 (1991) ("[W]e look first to the statutory language and then to the legislative history if the statutory language is unclear."). In this case, however, the legislative history of the statute offers little additional insight. To be sure, the history confirms that Congress sought to strengthen the protections afforded under § 271. *See General Agreement On Tariffs And Trade (GATT): Intellectual Property Provisions: Hearings on H.R. 4894 and S. 2368 Before the Subcomm. on Intellectual Property and Judicial Administration of the House Judiciary Comm. and the Subcomm. on Patents, Copyrights and Trademarks of the Senate Judiciary Comm.,* 103rd Cong. 124 (1994) (statement of Bruce A. Lehman, Assistant Secretary of Commerce and Comm'r of Patents and Trademarks) (stating that the amendments "add to the rights of the patent owner"). The question remains, however, as to how much strength Congress wished to add to the parameters of a patent grant.

■ In its briefs and oral argument, Rotec points to Johnson's work in the United States as evidence of an offer to sell the claimed invention within the United States. The claimed invention was a tower crane supported articulated concrete conveyor belt system. As noted earlier, however, Johnson's work on the project focused only on the conveyor components of the concrete delivery systems. Johnson did not work, for example, on the system's crane components, which were designated to be supplied by Potain from either France or within China itself. Therefore, Johnson did not offer to sell the entire invention as claimed in the patent.

In *Deepsouth,* the Supreme Court considered the related question of whether "making" or "selling" less than the complete invention in the United States constitutes an act of infringement under § 271(a). The petitioner in *Deepsouth* made parts of various shrimp deveining machines covered by patents held by the respondent. These parts were manufactured in the United States. Instead of selling the machines fully assembled in the United States, however, the petitioner sold the parts to foreign buyers, who assembled the parts abroad. The respondent sued for infringement under § 271(a), claiming that the petitioner "made" and "sold" the inventions of the patents within the United States as those terms are used in the statute, because "the act of assembly ... is regarded ... as of no importance." *Deepsouth,* 406 U.S. at 524, 92 S.Ct. 1700.

■ The Supreme Court disagreed. It held that in order to infringe under § 271(a), the accused device must include all of the limitations contained within the patent claim, not just any one limitation. *See id.* at 528, 92 S.Ct. 1700. "We cannot endorse the view that the 'substantial manufacture of the constituent parts of (a) machine' constitutes direct infringement [under § 271(a) ] when we have so often held that a combination patent protects only against the operable assembly of the whole and not the manufacture of its parts." *Id.* We discern no reason to hold that an "offer to sell" under § 271(a) should be any different, particularly in the absence of any indication of Congress's intent to do so.[2]

---

2. After the decision in *Deepsouth,* Congress accepted the Court's invitation to provide "a clear and certain signal," 406 U.S. at 531, 92 S.Ct. 1700, by enacting 35 U.S.C. § 271(f),

which precludes competitors from avoiding liability simply by supplying components of a patented product from the United States and assembling them abroad. *See* 35 U.S.C.

We must still decide, however, what constitutes an "offer," as that term is used in § 271(a). As mentioned above, the amendment to § 271(a) served to implement our nation's commitments under the TRIPS agreements. Accordingly, we must recognize one of the agreements' declared purposes: harmonizing worldwide patent law. *See* Lisa B. Martin & Susan L. Amster, *International Intellectual Property Protections in the New GATT Accord,* 2 J. Proprietary Rts. 9, 9 (1993). Before the TRIPS agreements, the United States stood apart from its trading partners in limiting infringement protection only to actual "sales," as opposed to "offers for sale." Indeed, our first draft proposal during the TRIPS negotiations reflected our unique approach in setting forth only "making, using or selling" patented inventions as acts of infringement. *See* U.S. Draft Agreement on Trade–Related Intellectual Property Rights, Presented at GATT Uruguay Round Negotiations in Geneva May 14, 7 Int'l Trade Rep. (BNA) 708, 711 (May 16, 1990). Ultimately, however, the United States agreed to the broader protections provided by others, suggesting that the amendment to § 271(a) reflects the approaches of the other signatory nations.

In at least one such nation, the United Kingdom, the common law of contract does not limit the meaning of "offer for sale" in the context of patent infringement. In *Gerber Garment Tech. Inc. v. Lectra Sys. Ltd.,* 13 R.P.C. 383, 411–12 (United Kingdom Patents Court 1995), the infringer argued that offers are defined by contract law and that "pre-contract negotiations or an advertisement" do not infringe. *Id.* The court disagreed, reasoning that the patent law did not merely codify the "English law of contract" but rather acted to prevent others from "disturbing the patentee's monopoly." *Id.* It then held that mere advertising activities could infringe,

even if the activities do not meet the common law definition of offer. *See id.* The court reasoned that a patentee is harmed by an advertisement for a sale set to take place during the term of the patent. Conversely, a defendant may not be held liable for advertisements of sales outside the patent term, because the offer exhibited an express intent to avoid interfering with the patentee's conferred rights. *See id.*

Of course, we must ultimately decide this issue as a matter of United States law. This court first considered the meaning of "offer for sale" in the context of § 271(a) in *3D Sys., Inc. v. Aarotech Labs., Inc.,* 160 F.3d 1373, 48 USPQ2d 1773 (Fed.Cir. 1998). In that case, a patentee sued three defendants in the United States District Court for the Central District of California for infringement of a variety of patents. The patentee argued that the defendants were liable for "offering to sell" the inventions disclosed in the patents. The defendants moved to dismiss the suit for lack of personal jurisdiction, arguing that the plaintiff had failed to establish the elements for personal jurisdiction required by the United States Court of Appeals for the Ninth Circuit's due process test. The district court agreed, granted the motion and dismissed all claims. *See id.* at 1376, 160 F.3d 1373, 48 USPQ2d at 1775.

On appeal, we reversed. The court found that the personal jurisdiction issue was governed by the law of the Federal Circuit, not regional circuit law. It then applied the personal jurisdiction test set forth in *Akro Corp. v. Luker,* 45 F.3d 1541, 33 USPQ2d 1505 (Fed.Cir.1995), to the plaintiff's allegation of specific personal jurisdiction over the defendants. After concluding that the defendants' actions were purposefully directed at the residents of the forum state, thus satisfying the first prong of the test, the court considered the second prong: whether the claim arises

§ 271(f) (1994). § 271(f) does not, however, change the nature of § 271(a) liability, as it provides a separate cause of action. Hence, as to claims brought under § 271(a), *Deep-*

*south* remains good law: one may not be held liable under § 271(a) for "making" or "selling" less than a complete invention.

out of or relates to those activities. Because the plaintiff claimed that the defendants "offered" its patented inventions for sale in violation of § 271(a), the court considered the meaning of this recently added term. *See 3D Sys.*, 160 F.3d at 1377–1378, 48 USPQ2d at 1776–1777.

The defendants urged that California state law governed whether the defendants' activities constituted an offer to sell. The court, however, disagreed. It first noted that "[l]ittle interpretation of this change as it relates to direct infringement under § 271(a) has been given, and no guidance on whether state law applies when determining if an 'offer to sell' has occurred." *Id.* at 1378, 160 F.3d 1373, 48 USPQ2d at 1776. The court then observed that it had "rejected previous attempts to shape our personal jurisdiction law through state common law definitions of federal statutory terms as defendants suggest." *Id.* at 1379, 160 F.3d 1373, 48 USPQ2d at 1777. As a result, the court held that "[t]he statutory character of the 'offer to sell' requires us to 'look back to federal law on the conceptualization' of the 'offer to sell' itself." *Id.; cf. North Am. Philips v. American Vending Sales, Inc.*, 35 F.3d 1576, 1579, 32 USPQ2d 1203, 1205 (Fed.Cir.1994) (holding that determination of where a sale took place "requires a look back to federal law"). Similarly, the court rejected the argument that it might look to "on-sale bar" analysis under 35 U.S.C. § 102(b). "We decline to import the authority construing the 'on sale' bar of § 102(b) into the 'offer to sell' provision of § 271(a)." *3D Sys.*, 160 F.3d at 1379 n. 4, 48 USPQ2d at 1777 n. 4 (citing *Ferag AG v. Quipp Inc.*, 45 F.3d 1562, 1566, 33 USPQ2d 1512, 1515 (Fed.Cir.1995)).

The court then held that the defendants' price quotation letters were in fact offers to sell, even though they purported not to be on their face. "[T]o treat them as anything other than offers to sell would be to exalt form over substance." *Id.* at 1379, 48 USPQ2d at 1777. Accordingly, it found that "[a]s a matter of federal statutory construction, the price quotation letters can be regarded as 'offer[s] to sell' under § 271 based on the substance conveyed in the letters, i.e., a description of the allegedly infringing merchandise and the price at which it can be purchased." *Id.*

■ We recognize that *3D Sys.* was issued shortly after the Supreme Court issued its opinion in *Pfaff v. Wells Elecs. Inc.*, 525 U.S. 55, 119 S.Ct. 304, 142 L.Ed.2d 261 (1998); however, the analysis of an "offer to sell" under § 271(a) is consistent with the Court's analysis in *Pfaff* of § 102(b).[3] In *Pfaff*, the Supreme Court noted that the norms of traditional contract law should be the basis for the on-sale determinations under § 102(b). The Court specifically held that for the § 102(b) on-sale bar to apply, "the product must be the subject of a commercial offer for sale." *Id.* at 67, 119 S.Ct. 304, 142 L.Ed.2d 261, 48 USPQ2d at 1646. This analysis is not divergent from our § 271(a) analysis, because an offer for sale, whether made before or after a patent is applied for, or after it is granted, requires no more than a commercial offer for sale. Both sections invoke the traditional contractual analysis. Therefore, we similarly define § 271(a)'s "offer to sell" liability according

---

**3.** Of course, the jurisprudence surrounding the on-sale bar of § 102(b) is premised on different policy reasons. As we noted in *3D Sys.*:

> [t]he policy reasons underlying the on-sale prohibition of § 102(b) include the concern that patentees will commercialize their inventions while deferring the beginning of the statutory patent term, encouraging prompt and widespread disclosure of inventions to the public, discouraging the removal of inventions from the public domain

when the public has come to rely on their ready availability, and giving investors a reasonable period to discern the potential value of an invention.

*Id.* at 1379 n. 4, 160 F.3d 1373, 48 USPQ2d at 1777 n. 4. In contrast, the policy underlying the "offer to sell" liability under § 271(a) includes "preventing a competitor from generating interests in a potential infringing product to the commercial detriment of the rightful patentee." *Id.*

to the norms of traditional contractual analysis.

Our task here is similar to the task presented in *Enercon v. ITC*, 151 F.3d 1376, 47 USPQ2d 1725 (Fed.Cir.1998). In *Enercon*, we were required to set forth the meaning of the term "sale or importation" under § 337 of the Tariff Act of 1930, as amended. *See id.* at 1381, 151 F.3d 1376, 47 USPQ2d at 1729. After noting that neither the Tariff Act itself nor its legislative history provided any definition of either "sale" or "importation," we concluded that "Congress intended to give the term its ordinary meaning, thereby making an explicit definition unnecessary." *Id.* The court then turned to traditional sources on the meaning of the term, including dictionaries and the Uniform Commercial Code. *See id.* In this case, Congress has again elected not to provide an explicit definition of the term at issue. As a result, we conclude that the meaning of "offer to sell" is to be interpreted according to its ordinary meaning in contract law, as revealed by traditional sources of authority.

Rotec argues that, as in *3D Sys.*, Defendants "generat[ed] interest in a potential infringing product to the commercial detriment of the rightful patentee." *3D Sys.*, 160 F.3d at 1379 n. 4, 48 USPQ2d at 1777 n. 4. According to Rotec, a reasonable jury could review the evidence at hand and find that Defendants made an infringing offer to TGDPC in the United States.

■ We find that the evidence supports precisely the opposite conclusion. First, Rotec points to evidence that: (1) the offering parties met nine times in the United States about supplying a conveyor system for the Three Gorges Dam Project; (2) Johnson and Tucker designed and priced the contemplated system in the United States; and (3) the written offer identified Johnson as the supplier for the concrete system, and confirmed that Johnson had provided all relevant technical and financial documents. None of this evidence, however, establishes any communication by Defendants with any third party.

This directly contrasts with the facts in *3D Sys.*, in which the defendants' infringing "offers for sale" consisted of "price quotation letters sent by [defendant] Aaroflex to California residents." *Id.*, 160 F.3d at 1379, 48 USPQ2d at 1777.

In the absence of a communication with a third party, it is difficult to imagine any commercial detriment of the rightful patentee taking place. If, however, the court were to adopt Rotec's reasoning, it would effectively prohibit a patentee's competitors from: (1) studying a patent in anticipation of its expiration; (2) estimating the cost of producing a disclosed invention before the date of expiration; or (3) reviewing a patent to ascertain whether the claims read on a product currently in development. After all, each of these activities could also lead to "generating interest ... to the commercial detriment of the rightful patentee." *3D Sys.*, 160 F.3d at 1379 n. 4, 48 USPQ2d at 1777 n. 4. This interpretation goes far beyond the limited "right to exclude" provided under § 271(a). Furthermore, it ignores an object of the patent law as important as providing incentives to invent: disclosing new ideas to the public. *See Paulik v. Rizkalla*, 760 F.2d 1270, 1276, 226 USPQ 224, 228 (Fed. Cir.1985) ("[T]he grant of the right to exclude carries the obligation to disclose the workings of the invention, thereby adding to the store of knowledge without diminishing the patent-supported incentive to innovate.").

■ Rotec also points to evidence that representatives of TGDPC traveled to the United States in December 1996, where according to Rotec they spent two or three days at C.S. Johnson's headquarters in Champaign, Illinois conducting business relating to the Three Gorges Dam Project. This activity, says Rotec, took place only eight days before the contract was signed in China. Rotec's evidence of this alleged meeting consists of a declaration by Rotec President A. Stephen Ledger. In the dec-

laration, Ledger asserts that a Johnson official told him about the meeting:

> On Sunday, December 8, 1996, I met at Al Seeland's home in Glen Ellyn, Illinois, with a delegation from CTGPC [the China Yangtze Three Gorges Project Development Corporation], including Mr. Zhou Yong Fu, who was responsible for working with Rotec and TGDPC's contractor at Three Gorges Dam site on matters relating to the TowerBelt, Rotec's patented tower crane-based concrete placement system. *Prior to that meeting, Al Seeland informed [me] that the delegation had spent the preceding two or three days at C.S. Johnson's headquarters in Champaign, Illinois conducting business relating to the Three Gorges Dam Project.*

(emphasis added).

The district court found that the evidence was inadmissible hearsay:

> Ledger does not claim to have personal knowledge that the meeting took place and does not claim to have any knowledge as to the matters discussed at the meeting. It is well settled that a party opposing a motion for summary judgment must rely on "competent evidence of a type otherwise admissible at trial." Accordingly, "a party may not rely on inadmissible hearsay in an affidavit or deposition to oppose a motion for summary judgment." Here, Ledger's declaration is based upon hearsay and lacks the personal knowledge required to be admissible. As a result, Ledger's declaration regarding Seeland's statement is inadmissible hearsay and is "incompetent evidence to oppose summary judgment."

*Rotec Indus., Inc.,* 36 F.Supp.2d at 816 (citations omitted).

"We review evidentiary rulings under an abuse of discretion standard." *Munoz v. Strahm Farms, Inc.,* 69 F.3d 501, 503, 36 USPQ2d 1499, 1501 (Fed.Cir.1995) (citation omitted). Rotec argues that the statement was admissible as either a statement made in furtherance of a conspiracy,

see Fed.R.Evid. 801(d)(2)(E), or an admission of a party agent, *see* Fed.R.Evid. 801(d)(2)(D). Neither of these arguments has merit.

First, Rotec does not explain how the statement by Seeland "furthers" any alleged conspiracy. This is especially perplexing when, as in this case, the statement reveals purportedly truthful information to the alleged victim. If anything, Seeland's statement put Rotec on notice of the alleged conspiracy. *Cf. United States v. Mitchell,* 31 F.3d 628, 632 (8th Cir.1994) ("A statement that simply informs a listener of the declarant's criminal activities is not made in furtherance of the conspiracy; instead, the statement must 'somehow advance the objectives of the conspiracy.' ").

Second, Rotec does not establish that Seeland was an agent of the defendant parties. Although "an agency relationship can be created by contract or conduct, not all contracts create agency relationships and not all conduct creates agency relationships." *Chemtool, Inc. v. Lubrication Technologies, Inc.,* 148 F.3d 742, 745 (7th Cir.1998). The court must decide "whether the alleged principal has the right to control the manner and method in which work is carried out by the alleged agent and whether the alleged agent can affect the legal relationships of the principal." *Id.* Rotec offers no evidence that Seeland, or his employer Johnson, could affect the legal relationships of Defendants. Indeed, the Cooperation Agreement between Defendants and Johnson provides that "each party under this Agreement shall be responsible for its own Scope of Work." Accordingly, it may not be said that the district court abused its discretion in excluding the statement from its consideration.

In its Reply Brief, Rotec also offers the deposition testimony of Seeland as evidence that an offer was extended to TGDPC within the United States.

Q. And did you think you were misrepresenting to the Chinese that the country of origin was the USA?

R. Absolutely not. They knew—the Chinese knew everything we were doing at all times. We had—we were—we had them here, I[sic] them in Chicago, all the people here.

This, too, is insufficient. On its face, the statement does not indicate when the meeting took place, or among whom. It does not discuss whether the invention was described, or at what price. All this statement shows is that Seeland, perhaps on behalf of his employer, met with the Chinese at some indefinite point in time, and that the Chinese knew everything about Seeland's activities.[4] It does not show that any Defendant communicated a "manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Restatement (Second) of Contracts* § 24 (1979).[5] No reasonable jury could rely on this statement to find that an offer was extended within the United States. As a result, the district court did not err.

In sum, Rotec offers no evidence upon which a reasonable jury could find in its favor. Of the evidence to which it points in support of its "offer to sell" theory, only the statement by Seeland involves a communication between Defendants and a third party potential customer. This statement, however, was properly excluded by the district court as inadmissible hearsay, and in any event was insufficient to establish that Defendants extended an offer for sale of the claimed invention within the United States. As a result, there is no genuine dispute of any material fact on the issue of § 271(a) liability for an offer to sell, and Defendants were entitled to judgment as a matter of law.

C. Rotec's § 271(f)(2) Claim

■ The district court also granted Defendants' summary judgment motion on Rotec's claim under § 271(f)(2). Under § 271(f)(2),

whoever without authority supplies or causes to be supplied in or from the United States any component of a patented invention that is especially made or especially adapted for use in the invention and not a staple article or commodity of commerce suitable for substantial noninfringing use, where such component is uncombined in whole or part, knowing that such component is so made or adapted and intending that such component will be combined outside of the United States in a manner that would infringe the patent if such combination occurred within the United States, shall be liable for infringement.

35 U.S.C § 271(f)(2). On its face, § 271(f)(2) imposes liability only on those who "supply" or "cause to supply" any component of a patented invention. Rotec argues that the court must look past the section's face and consider it in light of § 271(a), as amended. According to Rotec, § 271(f)(2) now imposes liability on those who "offer to supply" any component of a patented invention, because Congress "surely intended to strengthen the patent laws." As a result, Rotec concludes that Defendants violated § 271(f) when they offered to supply the Johnson conveyor com-

4. The court notes that Rotec could have asked Seeland about the details of the meeting during Seeland's deposition. Whether Rotec did so, however, is not ascertainable from the record. In any event, we must review the district court's order in light of what is present in the record, regardless of what might have been presented.

5. Although not authoritative, the Restatement has long been recognized as useful in establishing the general law governing the law of contracts, including offers. *Cf. Enercon,* 151 F.3d at 1382 (holding that the "U.C.C. has been recognized as the general law governing the sale of goods and is another useful, though not authoritative, source in determining the ordinary commercial meaning of the term 'sale' ").

ponent, which was part of the patented system, from the United States.

▮▮▮▮▮ This is incorrect. The court may not read an amendment to one section of a statute as an amendment to an entirely different section of the statute in the absence of any statutory justification. If Congress wanted to amend § 271(f)(2), as it amended § 271(a), it could have easily done so. There is no general reason, however, for the court to play the part of surrogate legislature. "[W]hen the legislature has clearly spoken the law, the court's duty is to enforce it as written." *Telectronics Pacing Sys., Inc. v. Ventritex, Inc.,* 982 F.2d 1520, 1524, 25 USPQ2d 1196, 1199 (Fed.Cir.1992). The statute is clear on its face, and there is no legitimate reason to look any further. "A statute is by definition the law to be followed—not disregarded, effectively repealed, rewritten or overruled (unless unconstitutional)—in the federal courts." *In re Mark Indus.,* 751 F.2d 1219, 1224 224 USPQ 521, 524 (Fed.Cir.1984). "This Court is empowered to rewrite neither statutes nor regulations, however unwise, nor does it have the information base nor expertise to do so effectively." *Newport News Shipbuilding & Dry Dock Co. v. Garrett,* 6 F.3d 1547, 1558 (Fed.Cir.1993). The record contains no evidence that any Defendant "supplied or caused to supply" any component of a patented invention in or from the United States. Indeed, Rotec itself admits that all of the tower crane components were manufactured in either France or China and that the majority of conveyor components were manufactured in either China or Japan. Therefore, the district court correctly dismissed this claim.

## CONCLUSION

The decision of the district court is

*AFFIRMED.*

## COSTS

Each party to bear its own costs.

PAULINE NEWMAN, Circuit Judge, concurring in the judgment.

I conclude, as does the panel majority, that Rotec can not enforce its patent against the defendants. However, I reach this conclusion on different grounds. I write separately concerning two aspects of my colleagues' opinion:

First, the majority opinion necessarily accepts the critical premise that an "offer to sell" made in the United States can constitute patent infringement even when the contemplated sale could not infringe the patent. I do not believe that 35 U.S.C. § 271 is correctly so interpreted. I would decide the case on the straightforward ground that there is no issue of infringement under § 271(a) because, as is undisputed, no offer for sale was made whereby the sale itself could infringe the United States patent, a requirement of 35 U.S.C. § 271(i).

Second, the panel majority's reliance on the overruled *Deepsouth* case is inappropriate. In addition, the majority opinion misconstrues the statutory provision, 35 U.S.C. § 271(f), that overruled it.

### I

### *An Infringing "Offer to Sell" Must Be for the Contemplated Sale of an Infringing Product*

For purposes of the defendants' summary judgment motion, and fundamental to this litigation, it is assumed that the system that was offered and intended to be sold to China and installed at the Three Gorges Dam is the same as the "Tower Belt" system that is described and claimed in Rotec's United States patent. The summary judgment documents describe the activities of the Japanese Mitsubishi company, the French company Potain, and the American C.S. Johnson Company, working together for the purpose of supplying such a system to China. On the principles of summary judgment it is accepted that the described meetings occurred in the United States and elsewhere, including the visit to

the United States by representatives of China.

The bid document and the final sales contract were executed outside of the United States. The bid document listed the country of origin for some components as the United States, specifically conveyors, dumpers, and toolkit. The sales contract states the countries of origin of the components as France, Japan, and China, with no component listed as made in the United States. Nor does Rotec assert that any component of the system that was ultimately sold originated in the United States. The panel majority accepts, without discussion, that these premises can satisfy the "offer to sell" provisions of § 271, and thus decides the appeal on peripheral issues such as the admissibility of the evidence of a visit to the United States by representatives of China. However, an offer to sell a device or system whose actual sale can not infringe a United States patent is not an infringing act under § 271.

Before the 1994 amendments to § 271 the law in the United States was that liability for infringement was not incurred by offering to sell a patented invention, but only by its actual manufacture, use, or sale. *See, e.g., Laitram Corp. v. Cambridge Wire Cloth Co.*, 919 F.2d 1579, 1583, 16 USPQ2d 1929, 1932 (Fed.Cir.1990). In implementation of Article 28 of the Agreement on Trade–Related Aspects of Intellectual Property Rights (TRIPS), in 1994 various amendments were made to the United States patent statute, including the following:

> § 271(a) Except as otherwise provided in this title, whoever without authority makes, uses, **offers to sell,** or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent.
>
> § 271(i) **As used in this section, an "offer for sale" or an "offer to sell" by a person other than the patentee, or any designee of the patentee, is**

**that in which the sale will occur before the expiration of the term of the patent.**

(Relevant amendments emphasized.) Uruguay Round Agreements Act, Pub.L. No. 103–465 § 533, 108 Stat. 4809, 4988 (1994). Section § 271(i) resolved the issue that is before us. By requiring that the actual sale of the thing offered will occur before the patent expires, the statute makes clear that the sale must be one that will infringe the patent. The question before this panel was answered in the statutory enactment; I would resolve the issue on this ground.

Congress was undoubtedly aware of the litigation and debate of similar questions in European countries. In *Kalman v. PCL Packaging (UK) Ltd.*, 1982 F.S.R. 406 (at 1982 WL 221922), the United Kingdom court held that the statutory "offers to dispose of" the patented product "must be read as meaning, 'offers in the United Kingdom to dispose of the product in the United Kingdom.'" *See also Benton v. Latour et Fils SA*, Transcript: Larking 21 April 1993 (available on Lexis in "UK Cases, Combined Courts" database). In Georg Benkard *et al., Patentgesetz, Gebrauchsmustergesetz*, 422–24 (9th ed.1993), the authors discuss whether an offer made in Germany to sell a product outside of Germany constitutes infringement of a German patent, citing various factual situations that have arisen in litigation. The enactment of § 271(i) resolved any uncertainty in the interpretation of § 271(a), for implementation of the TRIPS provision in the United States.

Section 271(a) can not be read in isolation from § 271(i). A statute is construed and applied in a manner that does not render any of its provisions superfluous, contradictory, or illogical. *See Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 837, 108 S.Ct. 2182, 100 L.Ed.2d 836 (1988). The purpose of § 271(a) was to permit a patentee to act against threatened infringing sale by establishing a cause of action before actual sale occurred. It is explained that the

"main consequence of requiring an actual sale during the patent term in order to make the offer for sale an act of infringement appears to be that the date of infringement will reach back to the date of the original offer." Thomas L. Irving and Stacy D. Lewis, *Proving a Date of Invention and Infringement After GATT/ TRIPS*, 22 AIPLA Q.J. 309, 351–52 (Summer/Fall 1994) (the offer for sale will infringe only if the sale will occur before the patent expires).

Thus the patentee need not await an actual sale, and may seek injunctive relief and any damages that may have accrued due to the offer. It is clear, however, that an infringing offer to sell, § 271(a), must be of an item that would infringe the United States patent upon the intended sale, § 271(i). Thus an offer made in the United States, to sell a system all of whose components would be made in foreign countries, for sale, installation, and use in a foreign country, does not infringe the United States patent. Rotec has not raised any issue for consideration other than those arising under the provisions of § 271.

## II

### Deepsouth Has Been Overruled

In *Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518, 92 S.Ct. 1700, 32 L.Ed.2d 273 (1972), the Supreme Court confirmed that a United States patent was not infringed when the component parts of a patented machine were sold by the United States manufacturer to foreign buyers who assembled the machine outside of the United States. The Court observed that the law of infringement applied only when the patented machine was made, used, or sold in the United States, and that United States patents do not have extraterritorial effect. Since there was no direct infringement of the United States patent, the Court held that there could not be contributory infringement by the manufacturer of the component parts.

Congress enacted 35 U.S.C. § 271(f), "respond[ing] to the United States Supreme Court decision in [*Deepsouth* ], concerning the need for a legislative solution to close a loophole in patent law." 130 Cong. Rec. 28,069 (1984). *See also* S.Rep. No. 98–663 at 2 (1984) (describing the legislation as "reversal of *Deepsouth* decision"). Section 271(f)(2) is invoked by Rotec as applying to the situation wherein the defendants offered to provide from the United States the conveyor component of Rotec's patented system:

> § 271(f)(2) Whoever without authority supplies or causes to be supplied in or from the United States any component of a patented invention that is especially made or especially adapted for use in the invention and not a staple article or commodity of commerce suitable for substantial noninfringing use, where such component is uncombined in whole or in part, knowing that such component is so made or adapted and intending that such component will be combined outside of the United States in a manner that would infringe the patent if such combination occurred within the United States, shall be liable as an infringer.

In the sales contract, C.S. Johnson Company of Illinois had been replaced by Nippon Conveyor Co. of Japan as the provider of the conveyor system. With no remaining component made in the United States the application of § 271(f) was mooted, for no component originating in the United States was included in the system that was sold. However, it is incorrect to read § 271(f) in isolation from § 271(a). Indeed, the correct reading of § 271 includes § 271(f) in harmony with § 271(a) and § 271(i). So important and complex a question as an offer to sell components of a patented device should not be disposed of in dictum. Not only is it dictum, but the panel majority's reliance on *Deepsouth* to remove the benefit of the amendment of § 271(a) from the "loophole" plugged in

§ 271(f) is misguided, for the purpose of § 271(f) was to overrule *Deepsouth.*