**PC CLUB, Appellant,**

v.

**PRIMEX TECHNOLOGIES, INC., Appellee.**

No. 01–1220 (Opposition nos. 108,862 and 109,796).

United States Court of Appeals, Federal Circuit.

March 22, 2002.

Before MAYER, Chief Judge, RADER, and PROST, Circuit Judges.

PROST, Circuit Judge.

PC Club opposes the applications of Primex Technologies, Inc. ("Primex") to register the marks EMPOWER, and EMPOWER and design for goods identified as "electrical power supplies to provide an in-seat power supply in transportation vehicles, namely, aircraft, automobiles, boats, buses, trains and vans." *PC Club v. Primex Tech., Inc.*, Opposition Nos. 108,862 & 109,796, at 1 (TTAB Nov. 30, 2000) ("TTAB Opinion"). At issue in this case is whether Primex's EMPOWER mark and PC Club's ENPOWER mark are likely to cause confusion among potential consumers. The United States Patent and Trademark Office ("PTO") Trademark Trial and Appeal Board ("Board") dismissed the op-

positions on the basis that the likelihood of confusion between PC Club's ENPOWER trademark and Primex's EMPOWER trademark was de minimis. We *affirm*.

## BACKGROUND

PC Club is a manufacturer, wholesaler and retailer of computers, computer parts and computer peripherals under the ENPOWER trademark. TTAB Opinion, at 9. Primex, on the other hand, manufactures and markets a "system for routing power created by aircraft to outlets at the seats of air travelers," under the EMPOWER trademark.[1] *Id.* at 8. Specifically, Primex's product is intended to provide airline passengers a source of power for their laptop computers. *Id.*

PC Club filed two oppositions to Primex's registration of the mark EMPOWER, and EMPOWER and design, arguing there was likelihood of confusion between the parties' marks. The Board held that if any possibility of confusion existed, it was de minimis for the following reasons: 1) PC Club's and Primex's products are not competitive; 2) PC Club and Primex sell their respective products in different channels of trade; 3) consumers of PC Club's and Primex's products use a degree of care that would prevent confusion; and 4) although the marks are similar, the scope of protection the ENPOWER mark is entitled to is limited because it is not a strong mark. Accordingly, on November 30, 2000, the Board dismissed PC Club's oppositions to Primex's registration of the EMPOWER mark.

PC Club filed this timely appeal challenging the Board's decision to dismiss its oppositions to the registration of Primex's EMPOWER trademark. We have jurisdiction under 15 U.S.C. § 1071(a).

## DISCUSSION

### I

■ The PTO may refuse to register a trademark if it so resembles a registered mark "as to be likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1052(d) (1994). This court will determine if a likelihood of confusion exists on a case by case basis applying the factors set forth in *In re E.I. DuPont DeNemours & Co.*, 476 F.2d 1357, 1361, 177 USPQ 563, 567 (CCPA 1973). *see also Recot, Inc. v. Becton*, 214 F.3d 1322, 1326, 54 USPQ2d 1894, 1896 (Fed.Cir. 2000); *see also On–Line Careline, Inc. v. America Online, Inc.*, 229 F.3d 1080, 1084, 54 USPQ2d 1471, 1474 (Fed.Cir.2000).

The *DuPont* factors are: (1) the similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression; (2) the similarity or dissimilarity and nature of the goods or services as described in an application or registration or in connection with which a prior mark is in use; (3) the similarity or dissimilarity of established, likely-to-continue trade channels; (4) the conditions under which and buyers to whom sales are made, i.e. "impulse" vs. careful, sophisticated purchasing; (5) the fame of the prior mark (sales, advertising, length of use); (6) the number and nature of similar marks in use on similar goods; (7) the nature and extent of any actual confusion; (8) the length of time during and conditions under which there has been concurrent use without evidence of actual confusion; (9) the variety of goods on which a mark is or is not used (house mark, "family" mark, product mark); (10) the market interface between applicant

---

1. Primex has not limited its product to be used only in airplanes. In fact, its intent-to-use application includes other types of transportation vehicles. TTAB Opinion at 7.

and the owner of a prior mark; (11) the extent to which applicant has a right to exclude others from use of its mark on its goods; (12) the extent of potential confusion, i.e., whether de minimis or substantial; and (13) any other established fact probative of effect of use. *DuPont*, 476 F.2d at 1361, 177 USPQ at 567; *Recot*, 214 F.3d at 1326–27, 54 USPQ2d at 1897.

"Whether a likelihood of confusion exists is a question of law based on the underlying factual determinations." *Recot*, 214 F.3d at 1326, 54 USPQ2d at 1896; *On–Line Careline*, 229 F.3d at 1084, 56 USPQ2d at 1474. We review questions of law de novo. *On–Line Careline*, 229 F.3d at 1084, 56 USPQ2d at 1474. As for questions of fact, we must uphold the Board's factual findings unless they are unsupported by substantial evidence. *Id.; see also Recot*, 214 F.3d at 1327, 54 USPQ2d at 1897 at 1327 (citing *Dickinson v. Zurko*, 527 U.S. 150, 165, 119 S.Ct. 1816, 144 L.Ed.2d 143, 50 USPQ2d 1930, 1937 (1999)); *In re Gartside*, 203 F.3d 1305, 1315, 53 USPQ2d 1769, 1775 (Fed.Cir. 2000). The substantial evidence standard requires this court to determine whether a reasonable person might be able to conclude that the evidentiary record supports the Board's decision. *On–Line Careline*, 229 F.3d at 1085, 56 USPQ2d at 1475.

The first *DuPont* factor we consider is the "relatedness of the goods." *DuPont*, 476 F.2d at 1361, 177 USPQ at 567. The "relatedness of the goods" factor compares the goods in the applicant's application with the goods in the opposer's registrations. *CBS, Inc. v. Morrow*, 708 F.2d 1579, 1581, 218 USPQ 198, 199 (Fed.Cir. 1983). Even if it is determined that the parties' goods are not related to each other in kind, the goods could still be related in the mind of the consuming public as to their origin. *Packard Press, Inc. v. Hewlett–Packard Co.*, 227 F.3d 1352, 1358, 56 USPQ2d 1351, 1354 (Fed.Cir.2000). Goods are not related because they coexist in the same broad industry, "but are related if [they] are marketed and consumed such that buyers are likely to believe that the [goods] come from the same source, or are somehow connected with or sponsored by a common company." *Homeowners Group, Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1109 (6th Cir.1991). Therefore, the question that must be considered is whether the goods are so related that they are likely to be connected in the mind of a prospective purchaser. *Id.*

The Board concluded that the products are not competitive, and there is no evidence that a manufacturer, wholesaler, and retailer of computers and computer products would expand into the field of manufacturing power supply systems for transportation vehicles. TTAB Opinion at 16. PC Club contends that the Board ignored substantial evidence illustrating that the parties' products are, in fact, related. Specifically, PC Club argues that the Board, in its analysis, minimized the relationship between the parties' goods.

PC Club and Primex sell very different products under their respective marks. Primex sells a system that provides airline passengers a source of power for their laptop computers. *Id.* at 8. PC Club, on the other hand, sells computers, computer parts and peripherals. *Id.* at 9. Thus, based on the record we conclude that substantial evidence supports the Board's decision on this issue.

The next *DuPont* factor that we consider is the similarity or dissimilarity of established likely-to-continue trade channels. *See DuPont*, 476 F.2d at 1361, 177 USPQ at 567. With respect to this factor, the Board correctly noted that it must consider all the goods specified in Primex's application. It found there was a dissimilarity in the channels of trade because PC Club sells its product at wholesale or retail to

average consumers, whereas Primex's system is not the type of item that would be sold at retail.

Agreeing with the Board that there is not more than a theoretical possibility that Primex's goods would be purchased by general consumers at retail, we conclude that its ruling is proper. *See In re Massey–Ferguson Inc.*, 222 USPQ 367, 368 (TTAB 1983) ("[w]e are not concerned with mere theoretical possibilities of confusion, deception or mistake or with de minimis situations but with the practicalities of the commercial world, with which the trademark laws deal") (citing *Witco Chem. Co. v. Whitfield Chem. Co., Inc.*, 57 C.C.P.A. 804, 418 F.2d 1403, 164 USPQ 43, 44 (CCPA 1969)).

Finally we address the "conditions under which and buyers to whom sales are made, i.e., 'impulse' vs. careful, sophisticated purchasing." *DuPont*, 476 F.2d at 1361, 177 USPQ at 567. The Board concluded that based on this factor it could not find a likelihood of confusion because the parties' goods are likely to be purchased with care. TTAB Opinion at 20. We agree.

When goods are sold to consumers that exercise care there is less chance that confusion will occur. *Id.; see also Magnaflux Corp. v. Sonoflux Corp.*, 43 C.C.P.A. 868, 871, 231 F.2d 669 (1956) (confusion is less likely where the goods are expensive and are purchased after careful consideration than when they are inexpensive). The risk of likelihood of confusion is increased, however, when the products are relatively low-priced and subject to impulse buying because purchasers are held to a lesser standard of purchasing care. *Recot*, 214 F.3d at 1329, 54 USPQ2d at 1899 (citing *Kimberly–Clark Corp. v. H. Douglas Enter. Ltd*, 774 F.2d 1144, 1146, 227 USPQ 541, 542 (Fed.Cir.1985)).

Given the amount of money it costs to install Primex's EMPOWER system, it is clear that a purchaser of Primex's system will exercise, at a minimum, some degree of care. This is also true of PC Club's product. For instance, a purchaser of the ENPOWER laptop computer has to take into account a number of different choices (e.g., the amount of memory a purchaser wants the laptop to have). Thus, there is substantial evidence to support the Board's holding that the degree of care that purchasers of the parties' respective goods employ militates against finding a likelihood of confusion.

## II

PC Club also challenges certain evidentiary rulings made by the Board. First, PC Club argues that the Board erroneously admitted and allowed the use of third party registrations to determine the weakness of the ENPOWER and EMPOWER marks. In particular, PC Club contends that the registrations are not probative as to whether the marks in question are actually in use. PC Club further argues that the Board erred in its use of printouts from web sites to show that ENPOWER is a weak mark because the printouts violate the hearsay rule. We disagree.

We review evidentiary rulings under an abuse of discretion standard. *Rotec Indus., Inc. v. Mitsubishi Corp.*, 215 F.3d 1246, 1256, 55 USPQ2d 1001, 1008 (Fed. Cir.2000). Determining that a mark is weak suggests that consumer confusion is unlikely because the mark's components are so widely used that the public can distinguish minor differences in the marks even if the goods are related. *See Gen. Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 626 (8th Cir.1987) (citing *Telemed Corp. v. Tel–Med, Inc.*, 588 F.2d 213, 219 (7th Cir. 1978)). Third party registrations are relevant in determining whether a mark has appealed to others as a trademark element. *See Bost Bakery, Inc. v. Roland Indus. Inc.*, 216 USPQ 799, 801 n. 6 (TTAB 1982). Moreover, such registra-

tions are relevant in determining the distinctiveness of a mark. *Id.; see also Gen. Mills*, 824 F.2d at 626–27 ("evidence of third party usage of similar marks on similar goods is admissible and relevant to show that the mark is relatively weak and entitled to a narrower scope of protection.")

■ The Board did not use the registrations as evidence that the marks are in use, but rather as probative evidence that "power-variant marks in general, and phonetic equivalents of both opposer's and applicant's marks in particular, have appealed to others as a trademark element ..., and that such marks may not be particularly distinctive in [computer and electrical power systems] fields." TTAB Opinion at 16. Therefore, we conclude that the Board's use of third party registrations to determine the strengths of the ENPOWER and EMPOWER marks was proper.

■ Further, PC Club asserts that the web page printouts, which were used by the Board to determine that the ENPOWER mark was weak, were inadmissible hearsay. The Board used printouts from web pages to show that the marks have appealed to others as a trademark element, not to prove the truth of the statements contained in the websites. *See Raccioppi v. Apogee Inc.*, 47 USPQ2d 1368, 1371 (TTAB 1998) (articles were relied on to show that third parties have each applied to register marks for various services, not to prove the truth of the matter asserted). Thus, we conclude the Board's use of web page printouts was proper.

■ Finally, PC Club argues that the Board's decision to exclude the testimony of Mr. Kongkeo, PC Club's information system administrator, was erroneous. PC Club contends that Mr. Kongkeo's testimony addressed the potential danger to the ENPOWER laptop if it were connected to the wrong power supply, i.e., an EMPOWER power supply. The Board noted that even if it had considered Mr. Kongkeo's testimony, it would not have altered its decision because the evidence is not related to the central issue of likelihood of confusion. TTAB Opinion at 6 n. 5.[2] Given the Board's ruling that its decision would not have changed, we see no reason to disturb their finding on this issue.

CONCLUSION

For the foregoing reasons, the final decision of the Board is affirmed.

---

2. We also note that the likelihood of harm that can occur to the ENPOWER laptop if one uses the wrong adaptor is speculative, at best. In fact, PC Club's counsel stated in oral argument that there is no evidence of an instance of PC Club's computer "blowing up" by using the wrong adaptor. Even Mr. Kongkeo testified that the possibility of using the wrong adaptor with the ENPOWER laptop was remote.