CYBIOTRONICS, LTD., Plaintiff,

v.

GOLDEN SOURCE ELECTRONICS, LTD.; and Smoothline, Ltd., Defendants.

No. CV 99–10522ABC (CTX).

United States District Court, C.D. California.

Feb. 12, 2001..

William Robinson, Mayer, Brown & Platt, Los Angeles, CA, for plaintiff.

Kathleen Pasulka, James McClain, Brown, Martin, Haller & McCain, San Diego, CA, R. Wayne Olmsted, Balfour, McDonald, Olmsted, Costa Mesa, CA, for defendants.

## ORDER RE: MOTIONS FOR SUMMARY JUDGMENT (FED.R.CIV. PRO.56) BY DEFENDANT SMOOTHLINE, LTD.

COLLINS, District Judge.

This case involves cordless telephone and caller identification technology, the subject of three patents which Plaintiff claims are infringed by various products manufactured and/or sold by Defendants. Defendant Smoothline has filed two Motions for Summary Judgment, one under 35 U.S.C. § 287(a) alleging insufficient notice of Plaintiff's patents, and one under 35

U.S.C. § 271 claiming lack of infringing activity within the United States. The Motions came on for a regular hearing before this Court on February 12, 2001. After review of all of the papers filed by the parties, the case file, and oral argument, the Court hereby GRANTS the Motion pursuant to 35 U.S.C. § 287(a), and also hereby GRANTS the Motion pursuant to 35 U.S.C. § 271.

## I. PROCEDURAL HISTORY

On October 12, 1999, Plaintiff CYBIO-TRONICS, LTD. ("Plaintiff," or "Cybiotronics") commenced this civil action by filing a Complaint naming Defendants GOLDEN SOURCE ELECTRONICS, LTD. ("Golden Source") and SMOOTHLINE, LTD. ("Smoothline"). The Complaint alleges ownership by the Plaintiff of three patents related to telephone and caller identification ("caller ID") technology, and states that Plaintiff has developed, manufactured and sold products embodying inventions claimed by the patents. It further alleges the manufacture, use, importation, distribution, offer, and sale of products embodying inventions in the patents by the named Defendants. The Complaint accuses each Defendant of direct infringement, inducement of infringement, and contributory infringement that is allegedly continuing. *See* Complaint ¶¶ 6–17.

The Complaint alleges that Plaintiff has "placed the required statutory notice on all of its telephone and caller identification products manufactured and sold by Cybiotronics" under the patents. *Id.* ¶ 18. Plaintiff's prayer for relief seeks judgment against all Defendants, preliminary injunctive relief during the pendency of the action, permanent injunctive relief thereafter, compensatory damages, trebling thereof, reasonable attorneys' fees, costs, and interest, and an order forcing Defendants to deliver to Plaintiff all infringing products for destruction at Plaintiff's option. *See* Complaint at 4.

Both of the named Defendants subsequently filed a separate Answer and Counterclaim.[1] A contentious discovery relationship followed.

After many trips back and forth to Magistrate Judge Turchin by both sides of the case to compel discovery from the other, finally on December 15, 2000 Defendant Golden Source filed a motion for summary adjudication of non-infringement as to U.S.Patent No. 5,265,145 ("the '145 patent") and U.S.Patent No. 5,742,669 ("the '669 patent"). On December 22, 2000, the Court signed a Stipulation and Order submitted by Plaintiff and Golden Source continuing the hearing from January 8, 2001 to January 22, 2001, thereby giving Plaintiff two more weeks to file an opposition (by January 8, 2001). Nonetheless, on December 28, 2000, Plaintiff filed an *Ex Parte* Application seeking denial of the motion filed by Golden Source to allow Plaintiff more time to conduct discovery (pursuant to Federal Rule of Civil Procedure 56(f)). This Application was denied by the Court on January 4, 2001. Five days later, on January 9, 2001, rather than an opposition to the Golden Source motion, the Court received and signed a Stipulation and Order submitted by Plaintiff and Golden Source dismissing Plaintiff's claims against Golden Source regarding the '145 patent and the '669 patent.

In the meantime, on January 5, 2001, Defendant Smoothline filed the two Motions for Summary Judgment which are now before the Court. The first Motion for Summary Judgment (the "Marking Motion") seeks an adjudication of limitation on the period during which Plaintiff may seek damages for alleged infringement, on the ground that Plaintiff failed to adequately mark the products Plaintiff produced pursuant to the '145 patent, the '669 patent, and U.S.Patent No. 5, 883, 942 ("the '942 patent") (collectively "the patents-in-suit") as required to give con-

---

1. Smoothline filed its Answer and Counterclaim February 11, 2000; Golden Source filed its Answer March 8, 2000, an Amended Answer and Counterclaim April 27, 2000 and (after a Motion to Strike), a First Amended Answer and Counterclaim June 21, 2000.

structive notice (35 U.S.C. § 287(a)). The Marking Motion also denies any actual notice to Smoothline prior to the Complaint, and therefore disclaims any entitlement to damages before its filing.

The second Motion for Summary Judgment filed by Smoothline on January 5, 2001 (the "Infringement Motion") argues that Plaintiff has not and cannot produce any evidence that Smoothline has performed any infringing activities within the United States.[2] The Motion contends therefore, that because United States patents are limited in their legal effect to the United States (with certain limited exceptions), Smoothline cannot be found liable for infringement (35 U.S.C. § 271).

On January 16, 2001, the Court signed a Stipulation and Order filed by Plaintiff and Defendant Smoothline continuing the hearing on the two Motions for Summary Judgment from its initial date of January 29, 2001 to February 12, 2001. Plaintiff was thereby given until January 29, 2001 to file any opposing papers, and Smoothline until February 5, 2001 to file any replies to Plaintiff's oppositions.

On January 29, 2001, Plaintiff filed an Opposition to the Marking Motion ("Marking Opposition") and an Opposition to the Infringement Motion ("Infringement Opposition"), along with supporting documents.[3] In the opposing papers, Plaintiff argues, respectively, that there does exist evidence of Plaintiff's placement of marks on products it has manufactured, at least as early as January, 1999, and that there is evidence sufficient to find Smoothline liable for infringement. February 5, 2001, Smoothline filed replies to each ("Marking Reply" and "Infringement Reply," respectively), closing the papers.

2. The declarations, exhibits, and materials accompanying each of the Motions will be identified by reference to the Motion along with which they were filed. For example, the Declaration of Kathleen A. Pasulka, filed January 5, 2001 along with the Marking Motion, will

## II. LEGAL STANDARD ON A MOTION FOR SUMMARY JUDGMENT

The party moving for summary judgment has the initial burden of establishing that there is "no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); see British Airways Bd. v. Boeing Co., 585 F.2d 946, 951 (9th Cir. 1978); Fremont Indemnity Co. v. California Nat'l Physician's Insurance Co., 954 F.Supp. 1399, 1402 (C.D.Cal.1997).

If the moving party has the burden of proof at trial (e.g., a plaintiff on a claim for relief, or a defendant on an affirmative defense), the moving party must make a "showing sufficient for the court to hold that no reasonable trier of fact could find under than for the moving party." Calderone v. United States, 799 F.2d 254, 259 (6th Cir.1986) (quoting from Schwarzer, Summary Judgment under the Federal Rules: Defining Genuine Issues of Material Fact, 9 F.R.D. 465, 487–88 (1984)). Thus, if the moving party has the burden of proof at trial, that party "must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in [its] favor." Fontenot v. Upjohn Co., 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in original); see Calderone, 799 F.2d at 259.

If the opponent has the burden of proof at trial, the moving party has no burden to negate the opponent's claim. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party does not have the burden to produce any evidence showing the absence of a genuine issue of material fact. Id., at 325, 106 S.Ct. 2548. "Instead, ... the burden on the moving party may be discharged by 'showing'—that is, pointing out

be hereinafter identified as the "Pasulka Decl. (Marking)".

3. Plaintiff's supporting documents will also be identified by a parenthetical reference to that Motion to which they pertain.

to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* (citations omitted).

Once the moving party satisfies this initial burden, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings ... [T]he adverse party's response ... *must set forth specific facts* showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e) (emphasis added). A "genuine issue" of material fact exists only when the nonmoving party makes a sufficient showing to establish the essential elements to that party's case, and on which that party would bear the burden of proof at trial. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which a reasonable jury could reasonably find for plaintiff." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in favor of the nonmovant. *Id.* at 248, 106 S.Ct. 2505. However, the court must view the evidence presented "through the prism of the substantive evidentiary burden." *Id.* at 252, 106 S.Ct. 2505.

### III. FACTUAL BACKGROUND

All three of the original parties to this matter, Cybiotronics (Plaintiff), Golden Source, and Smoothline, are apparently businesses incorporated under the laws of Hong Kong, with their principal places of business in Hong Kong as well. *See* Complaint ¶¶ 3–5; Statement of Uncontroverted Facts & Conclusions of Law (Infringement) ("IUF") ¶ 1. It appears that all three companies are, *inter alia,* manufacturers who have produced telephone products for BellSouth, either directly or through intermediaries. *See* Statement of Uncontroverted Facts and Conclusions of Law (Marking) ("MUF") ¶ 10; Statement of Genuine Issues (Marking) ("MGI") ¶ 10 (not disputing this factual assertion).

Plaintiff is allegedly the owner, directly or by assignment, of the rights granted under the patents-in-suit (the '145 patent, the '669 patent, and the '942 patent), all of which relate to telephone and caller identification technology. *See* Complaint ¶ 6; Exhibit 2 to Infringement Opposition (the " '942 Patent Registration"); Exhibit 3 to Infringement Opposition (the " '145 Patent Registration"). Smoothline asserts that only the claims of the '145 patent (one apparatus claim) and the '942 patent (one apparatus claim and a method claim) have ever been asserted in this suit. *See* Marking Motion at 2. Though claims based on the '669 patent have not been dismissed, Plaintiff does not apparently contest that the claims at issue with respect to Smoothline are solely the identified claims based on the '145 and '942 patents.

Plaintiff has identified several models of telephones produced by Defendant Smoothline that allegedly infringe either the '145 patent of the '942 patent (or both). These include at least Smoothline model numbers 3800, 2–3722, 2–3726, 2–3730, 2–3733, 2–3736, and 2–3737. *See* Statement of Genuine Issues (Infringement) ("IGI") ¶ D. It appears that these models (the "accused products") were produced by Smoothline during the period from sometime in 1996 to sometime in 1999. *See* IGI ¶ E; Exhibit 5 to Infringement Opposition ("Ho Depo. (Plaintiff)") at 93–94. For purposes of these Motions, Defendant Smoothline does not argue that products it produced during this period (or any other) did not infringe on the patents-in-suit. Plaintiff alleges that during this period (actually from 1997 to 1999) Smoothline sold hundreds of thousands of accused products to an intermediary for BellSouth. *See* IGI ¶ F (relying on Exhibit 138 to Infringement Opposition, allegedly the sales figures showing sales by Smoothline and Golden Source to the intermediary (NAFT) during the operative years for this Complaint).

Plaintiff has also apparently manufactured telephones covered by the claims of the patents-in-suit, presumably during this

same period. *See* Complaint ¶ 8; MUF ¶ 8; MGI ¶ 8.[4] There is a factual dispute on whether Plaintiff complied with statutory marking requirements [5] during this period, for all or any part of it. Defendant claims there is no evidence that Plaintiff marked its products in a manner consistent with the patent statute.[6] *See* Marking Motion at 8–11. Plaintiff's response is that it marked its telephone caller ID products with the numbers of the relevant patents-in-suit, at least as early as January, 1999. *See* Marking Opposition at 2; Exhibit 2 to Marking Opposition.

The other primary factual disputes relate to the nature and the implications of the relationship, if any, between Defendant Smoothline and the American market. Smoothline is firmly of the opinion that it is a Hong Kong corporation, that it has done business only in Hong Kong or in China (also an engineering office in Korea), that it has never sold or offered to sell the accused products within the United States, and that it therefore is not subject to the reach of American patent laws for

direct, contributory, or inducement of infringement. *See* Infringement Motion at 2–4; *see also* IUF ¶¶ 1, 7, 8. Plaintiff argues that regardless of where Smoothline is or claims to be located, it has had sufficient contacts with U.S. companies and markets that it may be held liable under the patent statutes for infringement.

Prior to 1995, Smoothline apparently had never made a cordless telephone with caller ID functions. Smoothline's Managing Director at the time, Siu Kang Wong, asserts that Smoothline was first approached with the possibility of doing so in February 1995 by Robert Schweitzer ("Schweitzer"), a representative of (and also apparently a principal figure in) an entity called North American Foreign Trading Corporation ("NAFT"), which is headquartered in New York.[7] *See* IUF ¶¶ 4–6; Wong Decl. (Infringement) ¶¶ 4–6.[8] These discussions allegedly took place in Hong Kong. *See* Wong Decl. (Infringement) ¶ 6. According to Wong, Schweitzer came up with the required design elements. *See id.* ¶¶ 6–7.

**4.** The '942 patent did not issue until March 16, 1999, so there is some limit on the period during which products covered by its claims might be sold. The '145 patent issued on November 23, 1993, and the '669 patent on April 21, 1998. *See* Complaint ¶ 6 (giving wrong date of issuance for the '942 patent, as stated in its Registration); '942 Patent Registration; '145 Patent Registration.

**5.** The term "requirements" is used in the sense that notice in one form or another is a necessary precursor to recovery of damages; there is no "requirement", *per se*, that goods produced pursuant to a patent be marked as such; however, the patentee may not recover damages for infringement until the alleged infringer has received either actual notice of the patent and the alleged infringement, or may be imputed with constructive notice based on product marking(s) (or the Complaint alleging infringement of the particular patent(s) has been filed).

**6.** "Patentees, and persons making, offering for sale, or selling any patented article for or under them ... may give notice to the public that the same is patented, either by fixing thereon the word 'patent' or the abbreviation 'pat.', together with the number of the patent, or when, from the character of the article,

this can not be done, by fixing to it, or to the package wherein one or more of them is contained, a label containing a like notice. In the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice. Filing of an action for infringement shall constitute such notice." 35 U.S.C. § 287(a) (West 2000).

**7.** Plaintiff does not substantively dispute this description of the genesis of the accused products, though it claims an inability to do so because of Smoothline's alleged failure to make declarant Siu Kang Wong available for deposition. *See* IGI ¶¶ 4–6.

**8.** Smoothline had apparently been supplying cordless telephones to NAFT, and/or another Hong Kong company also represented by Schweitzer called Unisonic, for some time prior to 1995, but without the caller ID functions at issue herein. *See* Wong Decl. (Infringement) ¶ 4.

Smoothline asserts that the specifications provided by Schweitzer were examined by its engineers, and that Smoothline concluded that it was capable of producing the phones that Schweitzer wanted. At this time, Wong says that Smoothline and NAFT (through Wong and Schweitzer) entered into an agreement whereby Smoothline agreed to develop these caller ID telephones to be purchased by NAFT; Wong again asserts that all of these negotiations took place in Hong Kong. *See* IUF ¶ 6; Wong Decl. (Infringement) ¶¶ 6–7. Over the next year (apparently mid–1995 to mid–1996), Smoothline's engineers in Korea worked on designing the telephones to Schweitzer's specifications; during this year Wong says that the ongoing discussions with Schweitzer on design, manufacture and pricing all took place in Hong Kong. According to Smoothline, the telephones went into production in the third quarter of 1996. *See* IUF ¶¶ 7–9; Wong Decl. (Infringement) ¶¶ 8–9. The cordless telephones (with caller ID functions) were reportedly manufactured by Smoothline in China. *See* IUF ¶ 8; Wong Decl. (Infringement) ¶ 8.[9]

Subsequent models of the original telephones were also produced according to modifications and specifications provided by Schweitzer. *See* IUF ¶ 10; IGI ¶ 10; Ho Decl. (Infringement) ¶ 5. At this time, primary responsibility for interface with Schweitzer/NAFT on behalf of Smoothline had apparently been taken over by Cecil Ho, a Director, who took over this responsibility sometime in late 1996. *See id.*

According to Ho/Smoothline, all of the additional specifications and orders given by Schweitzer were again transmitted in Hong Kong. *See* IUF ¶ 10; Ho Decl. ¶ 5. Again, this is a point that is heavily con-

tested by Cybiotronics, which claims that there is documentary and other evidence of repeated transmissions by Schweitzer from the NAFT offices in New York to the Smoothline offices in Hong Kong. *See* IGI ¶¶ G–W. Plaintiff also asserts that Schweitzer works at least part of the time in New York, that among other things Smoothline sold some of the accused products to NAFT in New York, that Smoothline transmitted communications to NAFT in New York, that Smoothline negotiated various terms with NAFT in New York, and that Smoothline even sent samples of the accused products to NAFT. *See, e.g.,* IGI ¶¶ G–W. Furthermore, Plaintiff asserts that Smoothline sent samples of the accused products to laboratories in the United States for testing. *See* IGI ¶¶ II–KK.[10]

There is apparently no dispute that all of the accused products (telephones) at issue were manufactured by Smoothline at facilities in China. *See* IUF ¶ 11; IGI ¶ 11. According to Smoothline, Schweitzer had his own inspectors on-site at the Smoothline facilities in China. *See* IUF ¶ 11; Ho Decl. ¶ 6. Plaintiff does not directly dispute this point, but reiterates its contention that Smoothline shipped accused products into the U.S. for testing by Wyle Labs and Bellcore Labs. *See* IGI ¶¶ HH–KK. Smoothline asserts that after the products passed inspection in China, they were shipped to Hong Kong to NAFT pursuant to "FOB Hong Kong" terms. Under their agreement, Smoothline asserts that title to the telephones passed to NAFT upon delivery to an ocean carrier in Hong Kong. *See, e.g.,* IUF ¶ 12; Wong Decl. ¶ 10.

Smoothline further asserts that while the telephones sold to NAFT were still in

---

**9.** Cybiotronics disputes many of the facts attested to in the Wong declaration, again on the basis that it has not been able to depose this declarant, and is therefore unable to respond fully. Further, it is apparently disputed by Cybiotronics (as is discussed below) that no part of the negotiations for the design and manufacture of telephones by Smoothline for NAFT took place in the United States.

Cybiotronics claims that at least some of these negotiations took place by mail or fax (or telephone) between Schweitzer at NAFT offices in New York and Wong (or others) at Smoothline offices in Hong Kong. *See* IGI ¶¶ G–W.

**10.** This was apparently to test for compliance with FCC standards.

Hong Kong, NAFT would then in turn sell the telephones to BellSouth, and BellSouth would also take title in Hong Kong. *See* IUF ¶ 14. The parties heavily dispute the significance of these (two) transactions in Hong Kong. Smoothline claims that after transferring title to the telephones to NAFT, it no longer had any responsibility for or control over the shipping, destination, or risk of loss of the telephones. *See* IUF ¶¶ 15–19. Plaintiff points, however, to what it claims is evidence that Smoothline's obligations with respect to the accused products did not end once the products were shipped from Hong Kong. *See* IGI ¶¶ PP–QQ, 15–19.[11] However, Plaintiff does not dispute that the telephones were delivered according to "FOB Hong Kong" terms.

Smoothline further asserts that soon after each shipment arrived on board a common carrier in Hong Kong, and was transferred to NAFT, it was paid through letters of credit from Barclay's Bank in Zurich, Switzerland, issued on the authority of a Liechtenstein company named F.H.A. Handelsanstalt. Payment allegedly came directly to Smoothline by way of a Hong Kong bank. *See* IUF ¶ 20. It is undisputed that none of the telephones sold to NAFT had a Smoothline label on them; all or nearly all of them apparently had the BellSouth label. *See* IUF 22; IGI ¶ 22. Plaintiff also claims that Smoothline may have sold accused products to other American companies. *See* IGI ¶ 23.[12]

## IV. DISCUSSION

There are two Motions for Summary Judgment currently before the Court, each filed by Defendant Smoothline. The first argues that the lack of adequate marking on Plaintiff's own manufactured products as claimed by the patents-in-suit fails to meet the constructive notice provision in 35 U.S.C. § 287(a), therefore rendering the first date that Smoothline can be held to be on notice of the patents, and liable for damages, the date the Complaint was filed (October 12, 1999). The second Motion argues that Plaintiff can produce no evidence of any infringing activity by Smoothline within the United States, rendering any alleged infringement beyond the reach of U.S. patent laws. The Court addresses each of Defendant's two Motions in turn.

### A. Constructive Notice/Marking Under 35 U.S.C. § 287(a)

In order to collect damages for patent infringement, a patentee or owner of the exclusive rights granted by a U.S. patent must first give proper notice of the patent rights to any alleged infringer. In other words, damages are available only from a point in time at which an alleged infringer is on notice of the patent and of the allegedly infringing activity. *See American Medical Systems, Inc. v. Medical Engineering Corporation,* 6 F.3d 1523, 1536–38 (Fed.Cir.1993). The notice may be actual or constructive, and the burden of pleading and proving notice lies with the patentee or owner of the patent. *See Maxwell v. J. Baker, Inc.,* 86 F.3d 1098, 1111–12 (Fed.Cir.1996).

In other words, under the statute it is clear that " '[a patentee] is entitled to damages from the time when it either began marking its product in compliance with section 287(a) [, constructive notice,] or when it actually notified [the accused infringer] of its infringement, whichever was earlier.' " *Maxwell,* 86 F.3d at 1111 (quoting *American Medical Systems, Inc.,*

---

11. Plaintiff primarily points to Smoothline's apparent obligation to take back any defective units for credit, replacement, or repair, and the fact that the certificates of inspection apparently given to Smoothline by Schweitzer once a particular shipment was inspected did not relieve Smoothline of liability for defective products. *See* IGI ¶¶ PP–QQ; Exhibits 116 and 117 to Infringement Opposition.

12. This is not an exhaustive survey of the facts and disputes as presented by the papers; some additional facts will be discussed only as they become pertinent to the relevant analysis, below. However, this summary gives a sense of the factual parameters in this case.

6 F.3d at 1537).[13] Failing a showing of actual or constructive notice prior to instituting suit, filing a complaint creates actual notice. *See* 35 U.S.C. § 287(a) (West 2000) ("Filing of an action for infringement shall constitute [actual notice].").

Plaintiff makes no attempt in this case to show actual notice to Defendant Smoothline prior to the Complaint, either of the patent or of its alleged infringement.[14] Thus, for Plaintiff to have any right to collect damages for the period prior to the date the Complaint in this case was filed, October 12, 1999, Plaintiff must show accrual of constructive notice of the patents-in-suit by Defendant Smoothline.

Under the statute, constructive notice may be shown by a patentee through evidence of marking, of goods produced pursuant to the patent, with the U.S. patent number somewhere on the product or, where it is not practical to mark the product, on its packaging. *See Nike, Inc., v. Wal–Mart Stores, Inc.,* 138 F.3d 1437, 1446–47 (Fed.Cir.1998).

Whether Plaintiff complied with Section 287(a)'s notice-through-marking provision is a question of fact, on which Plaintiff bears the burden. *See Nike,* 138 F.3d at 1446; *Maxwell,* 86 F.3d at 1111. Where a patentee asserts infringement of both apparatus and method claims, and there is a physical product produced by the claimed method capable of being marked by the patentee, the patentee is required to mark its product in order to recover damages. *See American Medical Systems, Inc.,* 6 F.3d at 1538. Here, Plaintiff asserts that it has personally (i.e., not through licensees or other third parties) manufactured and sold products reading on the claims of the patents-in-suit;

thus, to take advantage of the notice-through-marking provision, Plaintiff must show it has marked its own products. *Cf. Maxwell,* 86 F.3d at 1111–12.

The patentee seeking damages bears the burden of proving notice-through-marking compliance by a preponderance of the evidence. "In determining whether the patentee marked its products sufficiently to comply with the constructive notice requirement, the focus is not on what the infringer actually knew, but on whether the patentee's actions were sufficient, in the circumstances, to provide notice in rem." *Nike, Inc.,* 138 F.3d at 1446 (citing *Amsted Industries,* 24 F.3d at 187). The Federal Circuit has clearly stated that full compliance is not achieved until the patentee shows that it "consistently marked substantially all of its patented products, and it was no longer distributing unmarked products." *American Medical Systems, Inc.,* 6 F.3d at 1538. Plaintiff must show not only that "substantially all" of the patented products were marked, but also that "once marking was begun, the marking was substantially consistent and continuous." *Nike, Inc.,* 138 F.3d at 1446; *see Maxwell,* 86 F.3d at 1112 (under "rule of reason" applied to licensees, 95% marking was sufficient).

Thus, "adequately marking a patented product only on occasion, and not as a matter of routine, is insufficient to support a finding of compliance with section 287(a)." *Calmar, Inc.,* 850 F.Supp. at 868 (citing, *inter alia, Hazeltine Corporation v. Radio Corporation of America,* 20 F.Supp. 668 (D.C.N.Y.1937) (finding that marking less than 65% of patented articles was insufficient to give notice)).[15] Though the determination of proper marking is a

---

**13.** Primary purposes of the notice requirement include preventing the accrual of damages for "innocent infringement," and providing each patentee with incentive to place the world on notice of the patent(s). *See, e.g., Calmar, Inc. v. Emson Research, Inc.,* 850 F.Supp. 861, 867 (C.D.Cal.1994); *American Medical Systems, Inc.,* 6 F.3d at 1538.

**14.** As the Federal Circuit has stated: "Actual notice requires the affirmative communication of a specific charge of infringement by a specific accused product or device." *Amsted Industries Incorporated v. Buckeye Steel Castings Company,* 24 F.3d 178, 187 (Fed.Cir. 1994). Plaintiff makes no showing that Defendant Smoothline was so informed.

**15.** *See also Devices for Medicine, Inc. v. Boehl,*

question of fact, it is appropriate to resolve on summary judgment where there is no issue of material fact as to substantial or consistent marking. *See Calmar, Inc.*, 850 F.Supp. at 868–69 (granting summary judgment on damages).

■ In this case, Defendant Smoothline asserts that Plaintiff has not and cannot make a showing that it has marked its products sufficiently to give notice to alleged infringers justifying an award of damages. Specifically, Defendant asserts that Plaintiff has declined to produce documents requested by Smoothline in discovery that would evidence any patent markings. *See* Marking Motion at 8–9 (referencing Defendants' Document Request No. 38). Smoothline further relies on deposition testimony from Schweitzer, who bought products from both Plaintiff and Defendant on behalf of NAFT, and was allegedly never informed of any duty by NAFT to mark any Cybiotronics product with a patent number. *See* Marking Motion at 8–9. Smoothline contends that Plaintiff never produced any evidence of marking of its products, let alone evidence sufficient to comply with the requirement of "consistent" marking. *See* Marking Motion at 9. Thus, Defendant urges summary judgment as to the availability of damages on the patents-in-suit in this case.

In response, Plaintiff asserts that there is sufficient evidence to allow a jury to infer that Cybiotronics was marking its products with the patent numbers of the patents-in-suit at least as early as January, 1999. Plaintiff's evidence of this marking, such as it is, consists of a declaration from a Cybiotronics employee (Wallace Chau, who states he is the Sales and Marketing Manager for Cybiotronics, and an employee since December 28, 1992) that Cybiotronics marked "certain of its telephone caller-ID products with at least" the numbers of the patents-in-suit, and he personally saw "Cybiotronics telephone caller-ID products marked with the '942, '669, and '145 Patent numbers." Exhibit 2 to Marking Opposition (the "Chau Decl. (Marking)") ¶ 2. Chau's declaration does not indicate any specific time period during which these marked products were allegedly observed, nor any quantity or proportion of the total Cybiotronics products that were produced in conformity with the patents that were so marked.[16]

Plaintiff further submits, along with this declaration, copies of purchase requisition forms allegedly sent by Cybiotronics to Lik Fung Engraving Mould Fty. in 1999. *See* Exhibit 2A to Marking Opposition (the "Engraving Invoices"). Chau claims that this entity "engraved the '942 and '145 patent numbers on Cybiotronics telephone caller-ID products." Chau Decl. (Marking) ¶ 4. Therefore, Plaintiff claims that the Engraving Invoices establish that Plaintiff was marking its products under the patents-in-suit at least as early as January, 1999.

Plaintiff's claim that these Engraving Invoices establish marking as early as January, 1999 is based on the fact that one Invoice seems to be dated January 9, 1999.[17] However, Plaintiff has misinterpreted the dating protocol of its own Invoices, as it seems clear that what Plaintiff believes is an Invoice dated January 9, 1999, is instead an Invoice dated September 1, 1999.[18] Therefore, based on the

---

822 F.2d 1062, 1066 (Fed.Cir.1987) ("Having sold the product unmarked, [plaintiff] could hardly maintain entitlement to damages for its use . . .").

**16.** Nor does Plaintiff attach any representations of the products / packaging at issue showing they were marked. Plaintiff's declarant explains: "I am in the process of obtaining samples of products marked with these patent numbers. Unfortunately, however, Cybiotronics is in the process of moving its facilities from one location to another, and

samples are not currently available." Chau Decl. (Marking) ¶ 3.

**17.** *See* Exhibit 2A at 59 ("Engraving Invoice # 1"), which is dated by hand with the notation "1–9–1999," and has no accompanying form(s).

**18.** Plaintiff assumes that the Engraving Invoices are dated in the American style (e.g., Month–Day–Year). Therefore, Plaintiff reads an Invoice with the notation of "1–9–1999" as

Invoices submitted to the Court, it appears that the earliest evidence of *any* marking by Plaintiff is perhaps August 2, 1999. *See* Exhibit 2A at 63 (Engraving Invoice dated by hand with notation "2–8–1999").[19]

In any event, even if the Court were to assume that the Invoices show marking as early as January, 1999, Plaintiff's evidence would be insufficient to stave off summary judgment on the issue of notice and damages prior to filing of the Complaint, for several reasons. First of all, it is not at all clear that the Court should even consider the documentary evidence, given that it was not produced in response to Defendant's Document Request No. 38, to which the Engraving Invoices are clearly responsive.[20] Secondly, even if the Court considers these Invoices along with the Chau affidavit, the evidence supplied by the Plaintiff is insufficient to show marking in compliance with Section 287(a) for *any* period of time, due to the clear legal requirements.

Plaintiff must be able to show not just that any products made in accordance with the patents-in-suit were marked, but also that *all* or "substantially all" of the products Plaintiff manufactured/sold were marked with the relevant patent numbers. *See, e.g., American Medical Systems, Inc.,* 6 F.3d at 1538. Furthermore, Plaintiff must be able to show that the marking was "consistent and continuous." *See id.* Yet the Chau declaration and the Engraving Invoices utterly fail to make this showing, even if the Court affords the greatest latitude to the Plaintiff and assumes the Invoices show what it claims they do.

What the Invoices show is quite unclear, at best, given that they are not written in English, are not translated into English, and are primarily written in Chinese.[21] Plaintiff has made no attempt to show that these Invoices reflect engraving of the patent numbers on actual products that were shipped in commerce,[22] nor any attempt to

having been filled out on January 9, 1999. *See* Engraving Invoice # 1. However, it seems clear that these Invoices are *not* dated in the American style, but instead use the dating protocol that is more common in other countries (e.g., Day–Month–Year). This is evidenced by at least two Invoices dated in such a manner that the American style would be nonsensical: one dated "16–8–1999" and another dated "18–8–1999." *See* Exhibit 2A at 67, 69. These Invoices clearly were dated on August 16 and 18, respectively. In addition, several of the hand-dated purchase requisition forms are accompanied by computer-dated purchase order forms which clearly show that a day-month-year format is in use. For instance, an Engraving Invoice dated "3/9/99" is accompanied by a purchase order form dated "09/01/99," an Invoice dated "6/8/99" is accompanied by a purchase order form dated "08/03/99," an Invoice dated "18/8/99" is accompanied by a purchase order form dated "08/17/99," an Invoice dated "7/9/99" is accompanied by a purchase order form dated "09/05/99," and finally, an Invoice dated "3–8–1999" is accompanied by a purchase order form dated "08/03/99." *See* Exhibit 2A at 61, 62, 65, 66, 69, 70, 73–76.

19. Plaintiff also has a somewhat curious response to Smoothline's contention that it did not produce any documentation in response to Document Request No. 38. Plaintiff seems to treat its response that it *would* produce responsive documents as actual *production* of those documents. *See* Marking Opposition at 2 ("Cybiotronics stated that it would produce responsive documents ... Smoothline has thus proceeded with a Motion it knows is doomed to failure ...").

20. For example, Document Request No. 38, served on July 19, 2000, seeks evidence of marking: "38. If Cybiotronics ever applied patent markings to any article sold or offered for sale and asserted to fall within the scope of one or more claims of the patents-in-suit ... all documents relating to, reflecting or evidencing said markings." In its August 21, 2000 response, Plaintiff stated that such documents would be "produced at a mutually convenient time," yet it appears that the first appearance of the Engraving Invoices has been to accompany Plaintiff's Opposition to the instant Motion, filed January 29, 2001, more than six months after the Document Request was served. In its Reply, Defendant Smoothline asks that both the Chau declaration and the Engraving Invoices not be considered. *See* Marking Reply at 8.

21. The Court is not familiar with the characters on the Invoices, and can only assume based on the background of this case that they are Chinese characters. No indication of the language at issue is given.

22. As Defendant Smoothline points out in Reply, in order for the notice-through-marking

indicate a quantity or proportion of products that were allegedly so marked. Even if the Court assumes that the Invoices show marking of products sold by Plaintiff pursuant to the patents-in-suit, there is no basis for the Court to determine if Plaintiff marked "substantially all" of its products, if it did so in a "consistent and continuous" manner, or if Plaintiff *also* shipped a significant number of unmarked products.

In effect, the evidence presented by Plaintiff, *at best*, shows only that *some* of Plaintiff's products *may* have been marked, as early as August 2, 1999. There is no connection between the Invoices and any actual shipments of products, nor any indication of the quantity of products so marked, or the total number of products sold. Thus, while Plaintiff may have created a genuine issue of material fact as to whether *any* products were marked, Plaintiff has wholly failed to create a genuine issue as to whether enough products were marked so as to comply with the constructive notice provision of Section 287(a).

Given that the Engraving Invoices, at best, only show marking as of August 2, 1999, and that for any time period they are insufficient to show the kind of "consistent" and "continuous" marking of all or "substantially all" of Plaintiff's products, and also given that the declaration submitted by Wallace Chau makes no reference to any time period, number, or proportion of Plaintiff's products marked with the patents-in-suit, Plaintiff has failed to demonstrate the existence of a genuine issue of material fact on constructive notice. In other words, no reasonable jury could find that Plaintiff adequately marked its products so as to take advantage of the notice provision. Thus, Defendant Smoothline's Motion for Summary Judgment on the issue of notice under Section 287(a) is hereby GRANTED. Defendant Smoothline is not liable in damages for infringement prior to the Complaint.[23]

## B. Infringing Activity Under 35 U.S.C. § 271

Defendant Smoothline also seeks summary judgment on the ground that it has not made, used, offered to sell, sold, or imported any patented invention within the United States, has conducted activities relating to the patents-in-suit only in Hong Kong (or China), and can therefore not be liable for direct infringement. *See* Infringement Motion at 2–3. Smoothline also argues that it cannot be liable for inducement of infringement or contributory infringement. *See id.*

In order to be liable for direct patent infringement pursuant to 35 U.S.C. § 271(a), an alleged infringer must "make[ ], use[ ], offer[ ] to sell or sell[ ] any patented invention[ ] within the United States or import[ ] into the United States any patented invention during the term of the patent ..." 35 U.S.C. § 271(a) (West 2000). As the statute makes clear, and as the Federal Circuit has recently reiterated, the only activities that are relevant to direct infringement are those activities that take place within the borders of the United States. Extraterritorial activities are irrelevant. *See Rotec Industries,*

provision of Section 287(a) to be invoked, not only must it be shown that products at issue were adequately marked, but also that they were actually shipped in commerce. In other words, the "accrual date" for purposes of patent infringement damages is the date on which properly-marked products are shipped. *See* Marking Reply at 6 (citing *American Medical Systems, Inc.,* 6 F.3d at 1537–38). Thus even the Engraving Invoices do not show any actual *dates* of "notice."

23. The Marking Motion, almost as an aside, also seeks a finding that there were in-

fringing activities after the filing date of the Complaint, and that therefore no damages should be available at all. This request also seems to be premised on Section 287(a). *See* Marking Motion at 12. However, to the extent that this request is premised on Section 287(a), the Court will not go beyond its finding that the date of "notice" for purposes of infringement damages is October 12, 1999. Therefore, it will not reach the question, for purposes of the Marking Motion, whether damages would be available for any period thereafter.

*Inc. v. Mitsubishi Corporation,* 215 F.3d 1246, 1251 (Fed.Cir.2000) (" '[t]he right conferred by a patent under our law is confined to the United States and its territories, and infringement of this right cannot be predicated of acts wholly done in a foreign country.' ") (quoting *Dowagiac Mfg. Company v. Minnesota Moline Plow Company,* 235 U.S. 641, 650, 35 S.Ct. 221, 59 L.Ed. 398 (1915)). Therefore, Cybiotronics must be able to point to some infringing activity (making, using, offering to sell, selling, or importing infringing products) by Smoothline that took place *within* the United States. Smoothline argues that Plaintiff cannot do so.

▮ In order to be liable for inducement of infringement pursuant to 35 U.S.C. § 271(b), a defendant must "actively induce[ ] infringement of a patent ..." 35 U.S.C. § 271(b) (West 1984). "Thus, a person infringes by actively and knowingly aiding and abetting another's direct infringement. Although section 271(b) does not use the word 'knowing,' the case law and legislative history uniformly assert such a requirement." *Water Technologies Corp. v. Calco, Ltd.,* 850 F.2d 660, 667 (Fed.Cir.1988) (citations omitted). There must be specific intent to encourage infringement of the patent. *See Manville Sales Corp. v. Paramount Sys., Inc.,* 917 F.2d 544, 553–54 (Fed.Cir.1990).

▮ In order to be liable for "contributory" [24] infringement pursuant to 35 U.S.C. § 271(c), a defendant must be shown to have "offer[ed] to sell or [sold] within the United States or import[ed] into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in ... a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for [infringing] use ... and not a staple article or commodity of commerce suitable for substantial noninfringing use ..." 35 U.S.C. § 271(c) (West 2000). The requirement of "knowing" action by a defendant is explicit in the contributory infringement provision, Section 271(c) (it has merely been "read" into Section 271(b)). Therefore, as is well settled, to be liable for contributory infringement an accused infringer must know of the patent and the infringement. *See Aro Mfg. Co. v. Convertible Top Replacement Co.,* 377 U.S. 476, 487–90, 84 S.Ct. 1526, 12 L.Ed.2d 457 (1964) [25]; *Dynamis, Inc. v. Leepoxy Plastics, Inc.,* 831 F.Supp. 651, 654–55 (N.D.Ind.1993); [26] *Trell v. Marlee Electronics Corp.,* 912 F.2d 1443, 1447 (Fed. Cir.1990).

### 1. There is No Proof of Inducement or Contributory Infringement

Taking the easier issue first, the Court notes that Plaintiff is barred as a matter of law from any finding of liability under either Section 271(b) or Section 271(c). There are numerous obstacles to any such finding, none of which are surmounted in this case. The Court briefly details these logistical/legal hurdles in what follows.

▮ As has been stated, liability under Section 271(b) is contingent on a showing

---

**24.** Prior to 1952, patent infringement was divided only into two categories: "direct" infringement (which apparently included what is now thought of as inducement, a form of "contributory" infringement), and "contributory" infringement, which meant supplying of components. *See Hewlett–Packard Co. v. Bausch & Lomb Inc.,* 909 F.2d 1464, 1469 (Fed.Cir.1990) (noting the Patent Act of 1952 divided "contributory infringement" into § 271(b) "active inducement," which had been a form of direct infringement, and § 271(c) "contributory infringement," which is what had always been known as contributory infringement).

**25.** "[A] majority of the Court is of the view that § 271(c) does require a showing that the alleged contributory infringer knew that the combination for which his component was especially designed was both patented and infringing." *Aro Mfg. Co.,* 377 U.S. at 488, 84 S.Ct. 1526.

**26.** The "focus in a contributory infringement claim is on whether the accused infringer knows that the intended use of the product will infringe a known patent." *Dynamis, Inc.,* 831 F.Supp. at 655.

that the accused infringer "actively induced" another's infringement of the patent. This means that Section 271(b) liability requires proof of (1) an act by the defendant knowingly intended to induce another to infringe, and (2) actual infringement by the third party induced thereby. *See L.A. Gear, Inc. v. E.S. Originals, Inc.,* 859 F.Supp. 1294, 1299 (C.D.Cal.1994); *Young Dental Mfg. Co. v. Q3 Special Products, Inc.,* 891 F.Supp. 1345, 1348 (E.D.Mo.1995).[27]

In other words, there is no inducement of infringement without proof of an actual infringement, and the accused infringer must have had a specific intent to induce the actual infringement. *See Manville Sales Corp.,* 917 F.2d at 553–54. In this case, even if the Court is willing to assume direct infringement of the patents-in-suit,[28] there is no proof of Smoothline's specific intent to induce infringement.

Defendant's initial (Infringement) moving papers, and Plaintiff's Opposition thereto, spend a lot of energy debating whether an accused infringer can be liable under Section 271(b) for actions completely outside of the United States. *See* Infringement Motion at 14–17; Infringement Opposition at 15–16. It may be that Plaintiff has the better of these arguments, and

that inducement liability may in fact be premised on extraterritorial activities. However, because there is a much more serious obstacle to inducement liability in this case, the Court need not reach the question of extraterritorial inducement.

■ Instead, the Court notes that in its Reply Smoothline finally hit upon the crucial defect in the Section 271(b) claim: specific intent by Smoothline to actively induce infringement of the patents-in-suit necessarily requires that Smoothline first had *actual knowledge* of the patents-in-suit. *See* Infringement Reply at 13–14. Actual knowledge of the patent is clearly required under Section 271(b). *See Hughes Aircraft Co. v. National Semiconductor Corp.,* 857 F.Supp. 691, 699 (N.D.Cal.1994);[29] *L.A. Gear, Inc.,* 859 F.Supp. at 1300;[30] *Dynamis, Inc.,* 831 F.Supp. at 657;[31] *Manville Sales, Corp.,* 917 F.2d at 554; *Hewlett–Packard,* 909 F.2d at 1469; *National Presto,* 76 F.3d at 1196.

Rather than providing any proof of such actual knowledge of the patents-in-suit, Plaintiff argues that such knowledge is not required under Section 271(b). *See* Infringement Opposition at 16–17. This argument is unavailing, and based on misconstrual of authority.[32] A finding of ac-

27. For the same reason, the Federal Circuit has clearly said that an accused infringer cannot be liable under § 271(b) for activities, that would otherwise constitute inducement of infringement, that occur *prior* to issuance of the patent-in-suit, even if the same pre-issuance activities result in direct infringement *after* issuance of the patent. This is because of the requirement for "active inducement" that there be knowledge of the patent and specific intent to induce infringement. *See National Presto Ind., Inc. v. West Bend Co.,* 76 F.3d 1185, 1196 (Fed.Cir.1996) (affirming district court grant of summary judgment).

28. *See* Infringement Opposition at 14 (urging this assumption).

29. "In order to prevail in an action for inducement, a plaintiff must show that the defendant actually knew of the patent and intended to cause the acts which constituted the infringement. The intent requirement may be

satisfied by either direct or circumstantial evidence." *Id.* at 699 (citations omitted).

30. "In order to satisfy the second element, intent to induce the infringement, [plaintiff] must prove that [defendant] knew of the [patent] prior to taking these actions." *Id.* at 1300.

31. "[I]t is clear that under § 271(b) an accused infringer must be shown to have actual knowledge of the patent and the infringement and have the actual intent to induce the infringement." *Id.* at 657.

32. Only one of the cases cited by Plaintiff actually supports the proposition for which Plaintiff cites them: that actual knowledge of a patent is not required in order to induce infringement thereof. That case, *CVI/Beta Ventures, Inc. v. Tura LP,* 905 F.Supp. 1171, 1195–96 (E.D.N.Y.1995) was later partially overturned by the Federal Circuit on a different ground than that for which it is cited.

tual knowledge of the patent is clearly a prerequisite to finding that an accused infringer "actively induced" infringement of that same patent. In this case, no proof of actual knowledge prior to an allegedly inducing activity [33] has been alleged, let alone proven. Defendant asserts that it first became aware of the patents-in-suit when it was served with the Complaint December 22, 1999; [34] Plaintiff has provided no evidence to the contrary. As has been noted, there was no *constructive* notice prior to suit, let alone *actual* notice.

Therefore, in the absence of knowledge of the patents-in-suit, Smoothline could not possibly have had the specific intent to induce infringement of those patents. Accordingly, Plaintiff is barred as a matter of law from asserting liability under 35 U.S.C. § 271(b).

This absence of knowledge is also fatal to Plaintiff's claim for contributory infringement under 35 U.S.C. § 271(c). As previously noted, the "knowing" requirement is explicit in Section 271(c), such that actual knowledge of the patent and the infringement is requisite to a claim of contributory infringement.[35] *See Aro Mfg. Co.*, 377 U.S. at 488, 84 S.Ct. 1526; *Trell,*

912 F.2d at 1447; *Dynamis, Inc.,* 831 F.Supp. at 655. Therefore, Plaintiff can state no claim for contributory infringement without first showing Smoothline's knowledge of the patent. Actual knowledge was not acquired until December 22, 1999. Thus, as was true for inducement, no contributory liability accrued before that date.

Based on Plaintiff's failure to allege, let alone prove, accrual of actual knowledge of the patents-in-suit at any point prior to the date (December 22, 1999) on which Smoothline admits being served, the Court hereby GRANTS Defendant's Motion for Summary Judgment as to these claims. No liability could accrue before December 22, 1999.

### 2. There Are No Triable Issues as to Direct Patent Infringement

The final question to be decided is whether Plaintiff alleges and supports any basis for liability under 35 U.S.C. § 271(a), for direct infringement of the patents. In other words, has Plaintiff shown that Defendant Smoothline made, used, offered to sell, sold, or imported products infringing the patents-in-suit within/into the United

Even though it technically remains valid authority, all of its conclusions are called somewhat into question by the Federal Circuit opinion, and in any case neither its holding nor its reasoning are either binding or persuasive in light of the substantial authority (much from the Federal Circuit) finding the opposite. The remainder of the cases relied upon by the Plaintiff do not stand for the proposition for which Plaintiff cites them. They are either unrelated to the direct question of knowledge required for Section 271(b) liability, or directly support an opposite conclusion to that which Plaintiff draws from them. *See* Infringement Opposition at 17 (citing *Novopharm Ltd. v. Torpharm Inc.*, 181 F.R.D. 308, 48 U.S.P.Q.2d 1471, 1474 (E.D.N.C.1998), *Maxwell v. K Mart Corp.*, 851 F.Supp. 1343, 1349 (D.Minn.1994), and *Marsh–McBirney Inc. v. Jennings*, 22 U.S.P.Q.2d 1621, 1624 (C.D.Cal.1991)). Plaintiff is admonished for this mis-citation/mis-representation of pertinent authority.

**33.** It is in any case not at all assured that Plaintiff provided sufficient evidence of "acts" of inducement. However, given the lack of

proof of specific intent, the Court need not reach this question.

**34.** *See* Stipulation for Extension of Time filed December 29, 2000.

**35.** There are additional obstacles to a claim under Section 271(c) that the Court need not reach here, but which might present additional problems for Plaintiff's claim in this case. For instance, Section 271(c), by its terms, deals with supplying "component" parts that are used in a *combination* whole which infringes a patent at issue, or with supplying a "material or apparatus" for "use" in a patented process. It is not clear that this definition would apply to the alleged acts by Defendant Smoothline in this case, though no finding is necessary. Further, Section 271(c), by its terms, also only applies to "offers to sell" and sales "*within* the United States," and to "imports *into* the United States" of component parts, materials, or apparatuses. Here, there would again be a substantial question as to whether Defendant's alleged "contributory" actions, if any, took place within the U.S.

States. In what follows, the Court concludes that Plaintiff fails to raise a material issue of fact as to any of these grounds for liability.

First of all, with regard to making and using, Plaintiff makes no effort to argue or establish that Defendant engaged in any activity falling under these sub-headings within the confines of the United States. It is undisputed that any "making" of the accused products performed by Defendant Smoothline took place in China (and/or in Hong Kong or Korea), and that no accused products were manufactured in the United States. Nor does Plaintiff make any attempt to argue any "use" of accused products by Smoothline in the United States.[36]

Similarly, despite suggestions in its Statement of Genuine Issues that Smoothline may have "sold" some of the accused products within the United States,[37] Plaintiff makes no argument to that effect in its papers opposing the Infringement Motion. This is probably because no evidence supports an inference that Smoothline actually "sold" any of the accused products anywhere *within* the United States.[38]

Therefore, the only "infringing activities" for which Defendant Smoothline could *possibly* incur liability are any "offers to sell" or "imports" it performed within or into the United States. These two bases for relief are the primary focus of Plaintiff's Opposition. *See* Infringement Opposition at 2–13. However, the Court is unpersuaded. Plaintiff has failed to raise a triable issue of fact as to whether

Smoothline engaged in infringing activity within the United States.

### a. "Offers to Sell" Within the United States

■ Plaintiff argues that the evidence supports the inference that Smoothline has made "offers to sell infringing products in the United States." Infringement Opposition at 2. An "offer to sell" as a basis for liability was only added to the patent statutes effective January 1, 1996, and so is a relatively new type of direct infringement. As a result, "offer to sell" has received relatively little interpretation in the courts, and is not helpfully defined in the statute or in its legislative history. *See Rotec Industries, Inc.,* 215 F.3d at 1251–55; *3D Systems, Inc. v. Aarotech Laboratories, Inc.,* 160 F.3d 1373, 1378–79 (Fed.Cir. 1998); *Quality Tubing, Inc. v. Precision Tube Holdings Corp.,* 75 F.Supp.2d 613, 622–25 (S.D.Tex.1999); 35 U.S.C. § 271(i) (an "offer for sale" or an "offer to sell" includes only offers "in which the sale will occur before the expiration of the ... patent.") The unusual facts of this case also present their own challenges.

The Court is not writing on a completely blank slate, however. What the cases do indicate is that "offers to sell" should be judged by standards applicable to a typical "commercial offer." In other words, what constitutes an "offer" and what constitutes a "sale" are what might typically be considered to meet those terms in a general commercial context. *See Rotec Industries Inc.,* 215 F.3d at 1254–55.[39] On the other

---

**36.** In fact, Plaintiff does not allege that Smoothline itself made any "use" of the accused products, only that it manufactured them for the "use" of others, primarily NAFT, BellSouth, and their customers.

**37.** *See* IGI ¶¶ L, 23 (claiming Smoothline sold accused products to NAFT "in New York," and to other American companies somewhere).

**38.** The portions of the Ho deposition cited in IGI ¶ L do not show any sales to NAFT "in New York." *See* Ho Depo. (Plaintiff) at 22, 35, 104–105. Nor does the exhibit cited in IGI ¶ 23 (a list of tradenames and model numbers

apparently matching up BellSouth models with models for Ameritech, Bell Atlantic, and Pacific Bell) show that Smoothline "sold" any goods to these entities, let alone that any "sales" were in the U.S. *See* Exhibit 139 to Infringement Opposition at C00197.

**39.** Additional authority suggesting that an "offer to sell" should be judged by standards applicable in a commercial offer context is provided by *HollyAnne Corporation v. TFT, Inc.,* 199 F.3d 1304, 1309 (Fed.Cir.1999), in which the Federal Circuit held that an "offer to donate" goods which allegedly infringed a patent did not constitute an "offer to sell" bringing liability under the statute, absent

hand, the cases indicate that for purposes of assertion of personal jurisdiction consistent with due process, "where" a "tort" of patent infringement occurs will be a matter of federal law, rather than state contract law, due to the fact that patent infringement is a creature of statute. *See 3D Systems, Inc.,* 160 F.3d at 1379.[40]

"It is Smoothline's position that it never offered to sell the cordless telephones with caller-ID functions in the United States because all dealings with any offer to sell took place in Hong Kong and, in a technical sense, there was no offer to sell." Infringement Motion at 9. In other words, Smoothline argues that it never made any offer to sell within the United States, and implies (though does not argue) that its activities may not constitute an "offer" at all. *See* Infringement Motion at 9–14. Focusing largely on the "FOB Hong Kong" terms of the agreement between Smoothline and NAFT, and California statutes illustrating the effect of "FOB" terms in sales contracts,[41] Defendant claims that the contract was negotiated *and consummated* in Hong Kong, where "title" to the products "transferred." *See id.*

Plaintiff responds that there is evidence to indicate that at least some of the conduct/negotiation which preceded transfer of the accused products from Smoothline to NAFT took place within the United States. Specifically, from alleged evidence thereof in the deposition taken of Cecil Ho (and exhibits thereto), Plaintiff charges that the facts support the inference that Smoothline negotiated quantities of accused products to be sold to NAFT in communications transmitted to NAFT/Schweitzer in New York, that Smoothline sent transmissions to New York concerning the price of said accused products, that Smoothline's communications to New York also dealt with negotiating amendments to the letters of credit underlying sales between Smoothline and NAFT, with the quantity and types of "samples" (of the accused products) to be produced for NAFT by Smoothline,[42] with certain features that were desired for the accused products, and with testing of accused products in the United States. Plaintiff also charges that Smoothline filed documents on testing of its products with the Federal Communications Commission ("FCC"). Plaintiff claims that Smoothline took orders from NAFT/Schweitzer that

proof of actual sales that were transacted in connection with a donative offer.

**40.** The Court notes that there is a significant difference between saying that an "offer to sell" is sufficiently connected to a certain "place" to be sufficient for purposes of personal jurisdiction, versus saying that an "offer to sell" was "within the United States" for the purposes of finding direct infringement liability thereon. The due process concerns which guide determinations of personal jurisdiction focus on finding the constitutional "minimum" level of "contacts" upon which personal jurisdiction can be based. Thus, personal jurisdiction inquiries employ an *expansive* view of the meaning of "offers to sell"; the question is really whether under any reasonable interpretation of the statute, a defendant could be said to have "offer[ed] to sell" an accused product within the jurisdiction. The inquiry for purposes of determining the infringement liability is quite different, in that it should naturally be a more *restrictive* reading of the statute. Thus, while cases like *3D Systems, Inc.* are *instructive* on the question of

liability, they apply a different standard to determining whether and where an "offer to sell" has been made than applies to find liability.

**41.** Defendant offers no compelling basis for applying California statutes to this question. The Federal Circuit has stated (in a quite distinguishable context, but still an instructive statement) that, at least for purposes of personal jurisdiction, the meaning of the patent infringement statutes is controlled by federal law, *not* state contract law. *See 3D Systems. Inc.,* 160 F.3d at 1379 (noting that "the tort of patent infringement due to an 'offer to sell' is a federal statutory creation which is not limited by California contract law."). Thus, while Defendant's treatment of the California Commercial Code may be useful as a general guide to "FOB" terms, it is not controlling.

**42.** Plaintiff also notes (as is apparently undisputed) that actual samples of the accused products were sent to NAFT in New York. *See* Infringement Opposition at 4; *see also* Infringement Reply at 7.

were transmitted from New York, and responded to those orders with invoices/confirmations sent back to New York, and finally that representatives of Smoothline actually came to New York to negotiate with NAFT. *See* Infringement Opposition at 2–5, 10.[43]

As Defendant points out, Plaintiff quite often overreaches or even mis-characterizes the evidence that exists, in order to make it seem that much more of the accused conduct took place in the United States than really did. *See* Infringement Reply at 2–9.[44] However, this overstatement does not, as Defendant suggests, mean that there remains no evidence to suggest that at least some communications were sent to New York, and/or that some negotiation took place there.

What the Court can conclude from what has been presented is that Plaintiff has succeeded in raising a genuine issue of fact regarding whether transmissions were received from Smoothline in New York, and as to whether Smoothline representatives may have personally come to New York to conduct negotiations. The Court certainly does not and cannot conclude (based on Cecil Ho's equivocal and evasive testimony) that such transmissions *were* sent, and that such negotiations *did* take place, but construing the evidence in the light most

---

**43.** Plaintiff also points to alleged evidence that Smoothline's "obligations with respect to the accused products did not end once it placed them on an ocean liner." Infringement Opposition at 10. The "evidence" to which Plaintiff refers are two warranties of the accused products made by Smoothline: one stating that merchandise shipped in accordance with the Smoothline/NAFT agreement was "first quality" and "FCC approved," and that "defective units will be accepted back for full credit, repairs or for replacement at sellers['] expense and risk at any time at the discretion of [NAFT]" (Exhibit 116 to Infringement opposition; *see also* Ho Depo. (Plaintiff) at 81–82(authenticating)); the other being a "certificate of inspection" apparently issued after Schweitzer's representatives in China inspected each batch of accused products prior to shipment, which contains the text "this certificate of inspection is issued to permit the vendor [Smoothline] to negotiate his document under the above mentioned L/C (letter of credit) and does not relieve vendor of its liabilities if the goods are found to be defective [sic] after their arrival in the U.S.A." (Exhibit 117 to Infringement Opposition; *see also* Ho Depo. (Plaintiff) at 84–85). It is not clear how this is relevant, if at all, to the issue of whether Smoothline made "offers to sell … within the United States." The linkage is not made by Plaintiff, and is not obvious to the Court. It appears this is merely more evidence of Plaintiff's claim that there was an ongoing relationship between Smoothline and NAFT, and also of its contention that Smoothline was (and had to be) aware that some or all of the accused products it sold to NAFT were to end up in the U.S. Plaintiff may be trying to argue that because Smoothline retained some responsibility/liability for the products *after* they were transferred to NAFT, the sale was not fully

"consummated" outside the U.S. But if this is Plaintiff's argument, it is unavailing. Even *completed* sales often include a "money back guarantee"; they are nonetheless complete.

**44.** The Court does not find it necessary to belabor the point by illustrating the many examples of Plaintiff's overreaching. The Court observes that the main "fault" of which Plaintiff is guilty is that it repeatedly relies on equivocal statements by Cecil Ho in response to ambiguous compound questions about when and where negotiations with NAFT were conducted as "evidence" that the negotiations and attendant transmissions were "located" in New York. Plaintiff also repeatedly relies on exhibits which are correspondences on Smoothline letterhead that are addressed to individuals identified as NAFT representatives, and simply *assumes* that those (faxes, letters, invoices, etc.) were sent to NAFT offices in New York, without any proof thereof. Though it is certainly *possible* that those documents were sent to New York, it seems equally possible that they were sent to these representatives in other locations (e.g., Hong Kong or elsewhere). However, in spite of all of this, it appears that Cecil Ho does admit at least once in his deposition that it is *possible* that communications from Smoothline were sent to NAFT in New York; Ho also does not definitively *deny* that he or other Smoothline representatives may have conducted meetings in the United States, perhaps in New York. *See* Ho Depo. (Plaintiff) at 41–42, 66–71. These equivocal statements, and the exhibits to which Plaintiff cites, clearly do not *establish* what Plaintiff claims that they do, i.e., that Smoothline *did* transmit communications to New York and/or meet with NAFT in New York. However, they are sufficient to raise a genuine issue as to a *possibility* that these events occurred.

favorable to the non-movant, Plaintiff Cybiotronics, the Court concludes they *may* have.

The question is whether this genuine issue is a genuine issue of "material" fact. The Court concludes that it is not. *Even if* what Smoothline did in this case could credibly be described as an "offer to sell,"[45] and *even if* that "offer to sell" could credibly be said to have been made "within the United States," liability under Section 271(a) does not extend to "offers to sell" which do not contemplate actual "sales" of goods to be consummated within the United States.

There is very little guidance on the particular facts presented by this case, wherein a defendant is accused not of actually *selling* infringing products within the United States, but only of "offering to sell" those products within the United States, under an agreement that contemplates that the sale will be consummated elsewhere. The only case that directly presented the question of hinging liability on an "offer to sell" goods that would not end up in the United States, *Rotec Industries, Inc.*, did not decide the question presently before the Court because it found no (admissible) evidence of an "offer to sell" made "within the United States." *See Rotec Industries, Inc.*, 215 F.3d at 1257 (finding no basis for Section 271(a) liability).

One case that decides slightly different facts, but which still provides useful guidance on the proper interpretation of the "offers to sell" language, is *Quality Tubing, Inc.* In that case, the court was presented with an agreement made in the United States (i.e., there was indisputably an "offer to sell" made "within the United States") between an American company and a Norwegian company, that provided for products infringing a patent held by another American company to be manufactured in Scotland and delivered to Norway. *See Quality Tubing, Inc.*, 75 F.Supp.2d at 615–617. The American patent-holder (Quality Tubing) sued for direct infringement under Section 271(a), seeking a preliminary injunction, and the American company that had entered the agreement (Precision Tube) moved for summary judgment. In a quite enlightening opinion, the court granted defendant's motion for summary judgment, finding that defendant "has, as a matter of law, committed no act of infringement under section 271(a) or (g) by contracting, in the United States, to manufacture, sell, and deliver a product in Scotland and Norway, for use in Norway." *Id.* at 625.

In *Quality Tubing*, the court first noted that there was no basis for finding direct liability on the basis of a "sale," because while the contract was executed in the United States, any "sale" of goods was to take place outside of the United States. *See Quality Tubing, Inc.*, 75 F.Supp.2d at 619–21 (discussing, *inter alia, North American Philips v. American Vending Sales, Inc.*, 35 F.3d 1576, 1579 (Fed.Cir. 1994)).[46] The court then answered a ques-

---

**45.** The Court is tempted to conclude that Smoothline never made an "offer" in this case, given the apparently undisputed evidence that it was initially approached by Schweitzer on behalf of NAFT, that it was Schweitzer/NAFT that came up with all of the design elements and the modifications thereto, and that it was primarily Schweitzer/NAFT that transmitted orders and requests *to* Smoothline, rather than the other way around. It appears, in other words, that Smoothline's role was largely the "acceptor" in the offer-and-acceptance relationship that defines any "commercial" contracting situation. *See Rotec Industries, Inc.*, 215 F.3d at 1254–55. However, Plaintiff has raised at least the hint of doubt as to whether Smoothline may have taken the initiative in conducting "negotiations" with NAFT. Furthermore, though it was in a quite different context (personal jurisdiction), the Federal Circuit has warned that courts should not "exalt form over substance" for the purposes of determining what constitutes an "offer." Therefore, the Court will not definitively conclude that no "offer to sell" was made by Smoothline in this case, though the slim evidence of such an offer even being *made* bolsters the conclusion that no "offer" warranting a finding of liability under the statute took place in this case.

**46.** This Court will return to this analysis of issues presented in cases like *North American Philips* in the following discussion. This analysis informs the question of where "sales" occurred in this case.

tion it had posed at the outset of the case: does the "offers to sell ... within the United States" language of 35 U.S.C. § 271(a) forbid "(1) an offer to sell a patented invention in the United States; or (2) an offer, in the United States, to sell a patented invention." *Id.* at 614.

The court found that Section 271(a) only extends liability to the first of the two possibilities it identified: "offers to sell ... within the United States" are offers to sell that contemplate *sale* of the goods offered within the United States, and are not simply any offer to sell that happens to be *made* within the United States, where the goods offered will actually be "sold" in some other country.[47] The court therefore found that an "offer to sell" *made* in the United States was not itself sufficient for direct infringement liability. ·

This Court finds the *Quality Tubing* court's reasons for doing so highly persuasive. The court reasoned that the addition of the "offer to sell" language to Section 271(a) was not intended to add a whole new substantive *basis* for liability to the statute, but was merely intended to incorporate into the statute coverage of activities that might pre-date the actual *consummation* of a sale within the United States, but which nonetheless contemplate such a final sale.

> [E]xpanding the list of infringing activities ... to include an 'offer to sell' rather than merely a 'sale' protects a patent holder at an earlier stage of infringing activity. The patent holder no longer has to wait for an actual infringing sale before filing suit ... [but] can sue its competitor for infringement at an earlier stage, when there is an offer to make an infringing sale. However, the expansion of the statute to include the earlier stage of an infringing activity ... means that the sale for which the offer is made must

itself be an act of infringement. If it were sufficient to have an offer, in the United States, to sell in a foreign country, the sale offered would not be an act of infringement, and the offer to sell would not be an earlier stage of an infringing activity.... Because a sale is infringing only if it occurs within the United States, an offer to sell is not infringement unless the contemplated sale is to occur in the United States.... This construction does not expand the territorial jurisdiction of the United States patent laws and does not inhibit the ability of American companies to compete abroad.

*Quality Tubing, Inc.*, 75 F.Supp.2d at 623–25 (citations omitted).

In other words, the "offer to sell" language is to a "sale" at infringes the statute what an "attempt" prosecution is to the crime that is attempted. The addition of "offer to sell" to the statute merely allows a plaintiff to seek liability for activity that does not constitute a "sale," but which nonetheless threatens the patentee's right to an exclusive American market. However, the "offer to sell" language was *not* intended to (and could not) extend the protection of a U.S. patent to allow the patentee to also prevent sales taking place in other countries. Our patent laws are limited to the United States.

 Therefore, an "offer to sell" made *within* the United States that contemplates a "sale" of goods *outside* of the United States is not within the permissible scope of liability for 35 U.S.C. § 271(a). No direct infringement can be found solely premised on an "offer to sell" within the United States, unless the sale that is *contemplated* by the "offer" is or will also be consummated within the United States.

---

**47.** *See id.* at 614–15 ("Under the first interpretation, which Precision Tube advances, the phrase, 'within the United States,' qualifies 'offer to sell.' This interpretation requires the offer to be made within the United States and to contemplate a sale within the United States. Under the second interpretation, which Quality Tubing advocates, the phrase 'within the United States,' qualifies only the word 'offer.' Under this interpretation, an offer can be an act of infringement if the offer is made within the United States, regardless of where the contemplated sale will take place.' ")

The only remaining question, therefore, is whether there is any basis for arguing that the actual "sales" in this case were completed within the United States. In this case, unlike in *Quality Tubing*, the goods contemplated by the agreement were ultimately shipped to the United States. Therefore, although Plaintiff does not cogently argue this point, the Court must independently consider the question of a genuine issue as to whether a "sale" within the United States took place, and/or whether such a sale was contemplated in the "offers to sell" that may have been transmitted to NAFT in New York.

Smoothline argues that no "sales" were made within the United States, asserting that transfer of any "title" and "risk of loss" in the accused products, went first from Smoothline to NAFT, and then from NAFT to BellSouth, all in Hong Kong.[48] Therefore, Smoothline is essentially asserting that the "situs" of the "sale" was outside of the United States, which if true would permit Smoothline to escape direct infringement liability under Section 271(a) for its "offers."

Relying on *North American Philips*, Plaintiff argues that where a sale takes place should not be governed by contract law standards such as an "FOB" term in an agreement between two contracting parties. In essence, though it is not stated this way, Plaintiff is arguing that the transfer of "title" to NAFT and then to BellSouth in Hong Kong was a "legal fiction," upon which this Court should not rely in deciding whether there has been a direct infringement.[49] Plaintiff argues that Smoothline consummated a "sale" within the United States. *See, e.g.,* Infringement Opposition at 11–12 (also citing *Ensign–Bickford Co. v. ICI Explosives USA, Inc.,* 817 F.Supp. 1018, 1026 (D.Conn.1993)).

For a personal jurisdiction analysis, in *North American Philips* the Federal Circuit concluded that the "situs" of the "tort" of patent infringement was not necessarily determined by the "FOB" terms under which allegedly infringing products were promised or delivered. The court concluded that the "place" where legal title changed hands was not determinative of where the "sale" was made, and that it should instead be determined by the "more familiar places of contracting and performance." *North American Philips,* 35 F.3d at 1579–80. Thus, the court determined that the "FOB" terms were not dispositive, as the case had "nothing to do ... with the proper allocation of risk of loss between parties to the underlying sales contracts." *Id.* at 1580. The court thus found personal jurisdiction in the non-"FOB" state.

A similar result was reached in *Ensign–Bickford,* also cited by Plaintiff in this case, in that the district court concluded that, for purposes of personal jurisdiction, it need not be bound by the "FOB" term in a contract to find that the "sale" took place where "title" transferred under the "FOB" contract. *See Ensign–Bickford Co.,* 817 F.Supp. at 1026. The court therefore found that it was permissible to assert personal jurisdiction over the defendant in Connecticut, even though the underlying

---

48. Plaintiff presents no evidence to counter this contention. Indeed, Wong, Ho and Schweitzer are all unanimous in asserting that "title" as well as the "risk of loss" for all goods produced for NAFT by Smoothline "transferred" to NAFT upon delivery to a carrier in Hong Kong, in keeping with the "FOB Hong Kong" terms of the agreement between them. *See* Wong Decl. ¶¶ 10–13; Ho Decl. ¶¶ 6–7; Exhibit C to Declaration of R. Wayne Olmsted ("Schweitzer Depo.") at 218–219.

49. While the Court does not find, ultimately, direct infringement of the patent statutes by Smoothline on these facts, the Court notes the possibility of creating such a "legal fiction" merely to escape liability under the statute. However, in that the Federal Circuit has said that patent liability is specifically a creation of statute, and that its terms are therefore defined by the statute, the Court is not at liberty to extend the statute beyond its terms based on alleged "policies underlying the Patent Statute." *See* Infringement Opposition at 11. It is up to Congress to close this "loophole" in the statute.

contract stated that the infringing products would be delivered "FOB Canada." The court found that the devices at issue were "sold" within Connecticut, and within the United States. *See id.* at 1027–28 (basing personal jurisdiction on finding that the defendant had a "reasonable expectation" that the goods sold would "eventually arrive in Connecticut," despite the contract terms).

These cases are clearly distinguishable, not only because they deal with personal jurisdiction rather than with liability under the patent statute, but also because they focus only on the effect for a personal jurisdiction analysis that a "sale" elsewhere would have on the jurisdiction at issue. In addition, *North American Philips* was concerned only with asserting jurisdiction based on sales into other *states,* and did not confront the extraterritoriality question. On this question, the *Quality Tubing* court's analysis of *North American Philips* is also somewhat helpful. "In North American, the place of negotiation and execution of the contract was not at issue. The issue was whether the place of delivery of the contracted-for items was the place of the sale." *Quality Tubing, Inc.,* 75 F.Supp.2d at 621. *In North American Philips,* the court concluded that what should control is not where "title" passed, but where the contract was made and also where it was *performed.* In that case, these were different places.

Here, there seems no reasonable basis for dispute that the "sale" of goods from Smoothline to NAFT was (primarily) *negotiated* in Hong Kong, executed in Hong Kong, and was *performed* in Hong Kong. Thus, there is no "other place" where the "sale" might be said to have taken place, because *all* of the essential activities took place outside of the United States. Therefore, the Court concludes that there is no basis to find that the "sale" took place *within* the United States; even applying the somewhat disanalogous precedent of *North American Philips,* the Court concludes that the "sale" in this case happened in Hong Kong. It was also contemplated as such by the "offer."

Therefore, to the extent that the Court assumes that there were "offers to sell" within the United States, it finds that the "offers" did not contemplate any actual "sale" within the United States. Thus, the "offers to sell" that may or may not have been made to NAFT at its offices in New York may not form the basis for any liability under Section 271(a). Accordingly, although Plaintiff has created an issue of fact as to whether any "offers to sell" were made within the United States, it has not created an issue of "material" fact for liability because there were no contemplated "sales" within the United States.

### b. "Imports" Into the United States

 Defendant asserts that it has conducted no activities that might be considered "import[ing]" infringing goods into the United States, and that if anybody in this case has, it is NAFT and/or BellSouth. *See* Infringement Reply at 13. As support for its argument that it is Smoothline that should be held to account for the importation of the accused products into this country, Plaintiff points to what it claims is evidence of four "facts" that show Smoothline "import[ed]" accused products during the applicable time period: (1) that Smoothline sent working samples of the accused products to NAFT in New York; (2) that Smoothline arranged to ship its accused products into the port of Los Angeles; (3) that Smoothline at times took accused products out of containers on ocean liners and sent them via air transit to NAFT; and (4) that Smoothline itself shipped accused products to testing labs (Wyle Labs and Bellcore Labs) in the United States via DHI. Plaintiff also points out that Smoothline is listed as the "Shipper/Exporter" on the Bills of Lading that accompanied the shipments of accused products and (curiously) concludes from this that, inasmuch as Smoothline is the "exporter from" Hong Kong, it must also therefore be the "importer into" the United States. *See* Infringement Opposition at 6.

Again, Plaintiff has made more of the "evidence" than is really conveyed by the sources to which Plaintiff refers. While there seems to be no real dispute that Smoothline sent samples of accused products to NAFT in New York, Plaintiff uses the word "arranged" to describe Smoothline's role in the shipping of goods from Hong Kong to New York, when the truth appears to be somewhere closer to Smoothline playing a "coordinator" role in this process. *See* Ho Depo. (Plaintiff) at 114. Smoothline allegedly always did so pursuant to NAFT's instructions.

A similar lack of restraint is exhibited by Plaintiff's fervent characterization of Smoothline's activities in some instances where the products promised to NAFT were apparently needed more quickly than could be provided by aboard-ship delivery. Plaintiff claims that it was Smoothline that "took products out of containers on ocean liners and sent them via air transit to NAFT." Infringement Opposition at 6. What the evidence actually shows is much less clear. The exhibits to which Plaintiff refers, which are apparently fax transmissions from Smoothline to an NAFT representative, repeatedly reference shipment of products to "your forwarder" (presumably an intermediary acting on behalf on NAFT to whom goods were sent in Hong Kong or elsewhere, and who would then send the goods on to the United States). This suggests that perhaps the goods being shipped by "air transit" were either (a) being shipped by air *to* the forwarder, or (b) that it was the unnamed "forwarder" who was effecting the "air transit" shipment. *See, e.g.,* Exhibits 128 and 129 to Infringement Opposition. If anything, these exhibits only confirm that Smoothline was *not* directly engaged in the shipment of goods to the United States, however much it may have had a role in "coordinating" such shipments through the "forwarder." [50]

The Court is also wholly unpersuaded by Plaintiff's argument that because Smoothline is the "exporter from" Hong Kong, it must *also* be the "importer into" the United States. *See* Infringement Opposition at 6. This is contrary to logic; the very division between the two words suggests division of roles. When Smoothline is an "exporter," it *may* also be an "importer," but one does *not* necessarily imply the other.

The most that can be made of the evidence presented, again with the greatest latitude toward Plaintiff, the non-movant, is that it is *possible* that Smoothline itself played some role in "arranging" or "coordinating" the shipments of goods from Hong Kong to the United States at the behest of NAFT. It is apparently undisputed that these activities took place only *after* "title" to the accused products had already "transferred" to NAFT by virtue of delivery *to* Hong Kong. Two additional "facts" are also possible to infer from the evidence: it appears undisputed (for purposes of this Motion) that Smoothline did send working samples of its products to NAFT in the United States, and that Smoothline sent samples (via DHL) to U.S. labs for testing. The question is whether these "shipments" constitute "imports into the United States" for purposes of liability under 35 U.S.C. § 271(a).

Again, the Court concludes that it does not. Because Smoothline has not *itself* engaged in the conduct prohibited by the statute, i.e., "import[ing] into the United States," the Court may not extend the patent infringement statute to reach conduct which, while troublesome, is not within its terms. That authority is reserved to Congress.

Like the "offers to sell" language, the "imports into the United States" language was added to the statute defining infringement of patent to be effective as of January 1, 1996.[51] Therefore, it is likewise a

---

50. Nor do the cited passages of Ho's deposition illuminate this relationship at all, or provide support for Plaintiff's theory. *See* Ho Depo. (Plaintiff) at 121:24–122:8, 123:2–11.

51. Both additions were part of the 1994 Uruguay Round Agreements Act, Pub.L. No. 103–465, § 533(a)(1), 108 Stat. 4809, 4988 (1994).

relatively new basis for liability, and has received little judicial interpretation. It is also not blessed with a descriptive legislative history, or with further elaboration in the statute. The Court is therefore left to interpret the plain text of the statute.

Some guidance to that interpretation may be provided by cases construing 35 U.S.C. § 271(9)'s parallel language imposing liability on whoever "imports into the United States" products made by a process patented in the United States.[52] The parallel use of "imports into the United States" language means that cases construing the "imports" language of Section 271(g) may provide some guidance in this case.

One such case, *Pfizer Inc. v. Aceto Corporation,* 853 F.Supp. 104 (S.D.N.Y.1994), confronted a somewhat similar situation as that which is now before this Court. In *Pfizer,* a foreign manufacturer located and doing business in China manufactured a "flavor enhancer" (maltol) by use of a process alleged to violate plaintiff Pfizer's U.S. process patent. This Chinese manufacturer (Anhui) sold the accused flavor enhancer to another Chinese corporation, which in turn sold it to an American corporation that imported it into the United States. Anhui moved to dismiss claims under Section 271(g) on the ground that it did not itself import the product. The court granted the motion.

The court's reasons for doing so were that it seemed clear from its background, as well as the legislative history accompanying its addition, that "Section 271(g) was not intended, and indeed there is serious doubt whether Congress ... [could] prevent the use of a U.S. patented process in another country. Thus, § 271(g) 'will not give extraterritorial effect to U.S. law' and provides no remedy against foreign manufacturers whose infringing acts do not occur within the United States." *Pfizer Inc.,* 853 F.Supp. at 105 (quoting S.Rep. No. 83, 100th Cong., 1st Sess. 48); *accord Tec Air, Inc. v. Nippondenso Manufacturing U.S.,* 1997 WL 49300, *3–4 (N.D.Ill.1997).

Pfizer argued that liability could and should be based on what was clearly Anhui's "full knowledge" that products sold in China had a final destination in the United States; plaintiff sought "a broad reading of the term 'importer,' as used in the statute, to include a foreign manufacturer who knowingly sells to an importer even though it does not itself import the product into the United States." *Id.*

The court rejected this interpretation, however, and concluded that statements in the House and Senate reports accompanying the Act were "replete with commentary specifying that 'the offending act is the importation of a product made through the use of a protected process patent or its subsequent sale within the United States.'" *Id.* at 106 (quoting H.R.Rep. No. 60, 100th Cong. 1st Sess. 6). Thus, the court concluded that only the actual entity that itself "imported" the allegedly offending goods into the United States could be held liable under Section 271(g). The court also noted that "[t]his disposition does not leave Pfizer without a remedy because F & S, the remaining defendant in this case and the actual importer of the maltol, is subject to liability under § 271(g) and Pfizer may secure full redress from F & S should infringement be established. Such a result is precisely in accordance with Congress' intent in enacting § 271(g) to hold an importer of an infringing product liable." *Id.*

A similar conclusion would seem to apply in this case. Any and all activity that might be considered "import[ing] into the United States" was conducted by either NAFT or by BellSouth, and Smoothline itself was not the "importer" of the accused products. While it is possible that one of these entities directly infringed the patents-in-suit, either by importing the accused products into the United states or by selling them within its borders, Smoothline itself did not.

None of the evidence to which Plaintiff points, even if the Court assumes its legiti-

macy, proves otherwise. Assuming that Smoothline did in fact send samples of its products to NAFT in New York, that it did send other samples to American labs for testing purposes, and even that it did take an active role in coordinating NAFT's shipments, none of these activities transform Smoothline from the "exporter" in this transaction into the "importer" subject to liability under U.S. patent laws. Smoothline's shipments of samples for approval or testing were not for purposes of any direct commercial benefit, nor were they items that were being transmitted for purposes of sale. There is therefore no basis for concluding that these alone were "imports into the United States." Similarly, whatever role Smoothline may have played in the handling of shipments of products to the United States, it did so at all times under the aegis of NAFT's supervision, and the products were at that time the "property" of NAFT. No evidence to the contrary has been produced. Therefore, NAFT remained at all times the legal "importer" of these goods "into the United States," and the statute does not reach Smoothline's behavior in this case.

While it may be true that what Smoothline did in this case could be said to violate the "spirit" of the patent statute, and/or that it avoids liability only by maintaining the "fiction" of another entity (NAFT) acting as the "importer" of record, this is beyond the control of the Court. The fact remains that for the moment liability may only attach to that entity which actually "imports into the United States," and in this case that entity is either NAFT or BellSouth. There may be good arguments for also extending liability to an entity such as Smoothline in this type of transaction, but those arguments must be made to Congress. The current statute does not provide such relief.

In a case, such as this, where all of the voluminous shipping documents, invoices,

bills of lading, and other pertinent evidence [53] indicates that products were brought into the United States by and under the authority of NAFT, and/or on behalf of BellSouth, there is no genuine issue of material fact as to the party which in this case "imports into the United States." Whether it was NAFT or BellSouth, it clearly was *not* Smoothline, according to the evidence presented.[54]

### c. No Genuine Issue as to Direct Infringement Liability

As Smoothline points out in its Reply, "If Cybiotronics' patents were infringed, the infringement was by NAFT or BellSouth who imported and sold the products in the United States." Infringement Reply at 13. No evidence has been produced to show that Smoothline is in any way a related entity to either NAFT or BellSouth. While there is a possibility that *some* entity engaged in the actions that are at issue in this case is liable for patent infringement, that entity is not Smoothline, at least for infringement based on offering to sell or importing (or for inducement or contributory infringement).

Plaintiff has not provided evidence from which a reasonable jury may find that Smoothline made "offers to sell" or "imports" within or into the United States for direct infringement purposes. Accordingly, the Court hereby GRANTS Defendant Smoothline's Motion to the extent that it seeks dismissal of claims based on direct infringement.

### V. CONCLUSION

For the foregoing reasons, the Court concludes that there are no triable issues of material fact on the following questions: whether Plaintiff may seek damages for allegedly infringing activities prior to October 12, 1999; whether Smoothline is liable

---

**53.** *See, e.g.,* Appendix to Ho Decl. at SM 2322–3372 (Invoices and Bills of Lading); Appendix to Declaration of R. Wayne Olmsted at NF 000452–000527 (letters of credit drawn on Barclay's Bank).

**54.** The Court may not, as Plaintiff urges, look to the "economic realities" of this situation, and thereby ignore the statute's limits.

for inducement or contributory infringement for any period prior to December 22, 1999;[55] and whether Smoothline is liable for direct infringement at any time. On each of these questions, Plaintiff has failed to raise genuine issues of material fact, and its claims are subject to dismissal.

Accordingly, the Court GRANTS Defendant Smoothline's Motion for Summary Judgment on issues of notice and marking (35 U.S.C. § 287(a)), and STRIKES Plaintiff's prayer for damages to the extent that it is premised on any conduct prior to October 12, 1999. The Court also GRANTS Defendant Smoothline's Motion for Summary Judgment on issues of direct and indirect infringement (35 U.S.C. § 271(a), (b), and (c)), DISMISSES Plaintiff's claims of direct infringement entirely, and its claims for inducement of infringement and contributory infringement to the extent they are premised on conduct prior to December 22, 1999.

---

**55.** The Court notes that Plaintiff has only asserted activities by Smoothline constituting *direct* infringement from 1996 or 1997 through 1999, but neither side has presented the Court with enough information to determine whether there is any possibility of a period during which Smoothline had actual knowledge of the patents-in-suit, and was still allegedly engaged in inducement of infringement and/or contributory infringement. The Court will not address this question unless and until much more direct briefing and evidence is presented thereon.